[764 NYS2d 27]

**WORLD BUSINESS CENTER, INC., Appellant, v EURO-AMERICAN LODGING CORPORATION, Respondent.**

First Department, August 28, 2003

**APPEARANCES OF COUNSEL**

*John P. Gleason* of counsel (*Gleason & Koatz*, attorneys), for appellant.

*Catherine M. Foti* and *Stephen M. Juris* of counsel *(Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C.*, attorneys), for respondent.

## OPINION OF THE COURT

ANDRIAS, J.

This appeal arises from a complex transaction between numerous offshore corporations, many of which are controlled by a French businessman, for the sale of a Manhattan hotel of which plaintiff is the 30-year lessee of six floors. As part of the transaction, the lease was amended to provide for its cancellation or continuance contingent upon payment by defendant, the landlord, of $5,682,062 by October 15, 2001. Such payment was not timely made and, after plaintiff was refused possession of the leased premises, it commenced this action to enforce the lease amendment, seeking specific performance and damages. In the order appealed from, defendant's motion to dismiss this action and to compel arbitration was granted. We now reverse.

Plaintiff, World Business Center, Inc. (WBC), seeks to enforce an amendment to the parties' lease, which does not contain an arbitration clause. The lease amendment sued upon was one of many documents signed at the February 14, 2000 closing of the sale of the Flatotel building at 135 West 52nd Street in Manhattan of which plaintiff was the lessee of the unfinished second through seventh floors pursuant to a 30-year lease signed June 1, 1998. The original lease was signed by defendant Euro-American Lodging Corporation (EALC), as landlord, and WBC, as tenant, and was accepted and approved to the extent required by Macson Express USA, Inc. (Macson), the franchisee operator of the hotel. All of the signatories were corporations controlled by or on behalf of a certain Maurice Cohen. Whether or not WBC is still controlled by Mr. Cohen is disputed. The original lease was to be construed according to New York law and provided, inter alia, for a waiver of jury trial and the landlord's right of injunction in any action arising out of or in connection with the lease. Only in the event WBC exercised its option to purchase the leased premises and there was a disagreement between the landlord and tenant as to the amount of the purchase price did WBC and EALC agree to final arbitration by the American Arbitration Association in New York.

The total purchase price for the building was approximately $40 million, less any known liabilities. The transaction was

structured and the sale was effected by means of the sale to Ospin International, Inc. of options to acquire shares of the corporate stock of EALC and Macson. At the closing, the sellers, Iderval Holding, Ltd., Summersun International Establishment, International Groupotel Investment, Inc. and Blue Ocean Finance, Ltd., which owned the options or the corporate stock of EALC and Macson, had known liabilities of $1,367,938 and the purchase price was reduced accordingly. An additional $5,632,062 was withheld to insure payment of any unknown additional liabilities of the sellers, which were to be determined after the closing with the purchase price to be adjusted accordingly. To effectuate the transaction and secure the payment of the withheld payment, less any "Additional Liabilities," nine separate documents were executed. WBC was a signatory to three of the documents: the amendment of lease and two assignments of credit from two of the sellers, one from Iderval to WBC for $5,582,062 and one from Summersun to WBC for $50,000.

All nine documents were written in French and English and, except for the amendment of lease sued upon herein, which provides that the English version of the document controls in the event of difficulties in interpretation and that it is subject to and to be interpreted according to New York law and submitted to the jurisdiction of New York courts, all of the documents provide that the French version of each document is official and decisive and that they are subject to French law and the jurisdiction of the Court of Commerce of Paris.

Only two of the documents, to which WBC was not a signatory, the contracts for the sale of EALC stock between Iderval/Summersun and Ospin and the contract for the sale of Macson stock between Groupotel and Ospin, contain limited arbitration clauses concerning the sellers' guaranty of liabilities. Such liabilities consisted of all supplier and tax claims, with the exception of real estate taxes, which were incurred prior to the closing. Each contract provides for mediation in New York by two named attorneys, one representing the buyer and the other representing the seller. In the event the mediators were unable to resolve the dispute within 15 days, they were to designate a neutral arbitrator whose decision was to be binding and could not be contested. Each document also provides that it is to be interpreted according to French law and that any disputes resulting from or related to it would be submitted for mediation by the same two attorneys in New York and, failing resolution by the mediators within 15 days, the "most diligent

party" would institute a proceeding before the Court of Commerce of Paris to which the parties grant jurisdiction. Significantly, each contract provides that the clause concerning the determination of the guaranteed liabilities is an express waiver of the main clause of the contract which grants jurisdiction to the Court of Commerce of Paris.

Thus, even if the motion court may have been correct in characterizing the lease amendment as a security device to insure payment of the $5,632,062 portion of the purchase price withheld to insure payment of any of the sellers' additional liabilities, there is no support for its holding that the closing documents, when read together, "constitute a valid agreement to arbitrate the issues which are the subject of this litigation as the intention of the parties that there be final binding arbitration of the sole dispute between them before an arbitrator under New York law is clear." The court's ruling and its direction that the parties to this action, WBC and EALC (which, other than EALC, do not include any of the signatories to those documents containing the narrow arbitration clauses), arbitrate their dispute was based upon the fact that WBC's assignors (Iderval and Summersun) signed the agreements containing the narrow arbitration clauses and that all the agreements were executed at the same time and related to the same subject matter. Moreover, the court concluded that, since WBC and EALC agreed in their 1998 lease to submit "some disputes" to the American Arbitration Association in New York, "it would be reasonable and within the essence of the agreements" to direct the parties, as an alternative to the appointment by the court of an arbitrator pursuant to CPLR 7504, to proceed to arbitration under the rules of the American Arbitration Association.

Such ruling is unsupported by the record since it is apparent that the parties to what the motion court aptly described as "a multifaceted, contemporary business transaction" chose for the most part to settle any disputes arising from the transaction by mediation or, failing that, litigation in Paris. In the case of WBC's lease and the amendment thereto, WBC and EALC chose litigation in New York, where the hotel is located. Moreover, any reliance by the motion court upon WBC's and EALC's agreement in their original lease to arbitrate "some disputes" is misplaced since, as previously noted, the only issue they agreed to arbitrate was a disagreement regarding the purchase price in the event WBC exercised its option to purchase the leased premises. However, the lease amendment uncondition-

ally deleted the "Purchase Option" and thus, the limited issue of the purchase price, the only dispute WBC and EALC agreed to arbitrate, never arose.

The motion court's reliance upon *Grossman v Laurence Handprints-N.J.* (90 AD2d 95 [1982]) was likewise misplaced. *Grossman* did not involve a nonsignatory and merely held that boilerplate language regarding collection costs and attorneys' fees in a promissory note was insufficient to overcome the "very broad" arbitration provision in the parties' contract of which the note was an integral part. Here, on the contrary, all of the agreements, whether read together or separately, reflect that arbitration was limited to the issue of the amount of the purchase price. All other disputes regarding the sale of the building were to be determined in the Court of Commerce of Paris according to French law. The only exceptions were disputes arising from the amendment to lease which were to be resolved in New York courts pursuant to New York law.

It is clear from the record that the buyer and sellers anticipated that the issue of any additional liabilities, and thus any further adjustment of the purchase price, would be resolved by binding uncontestable arbitration no later than October 15, 2001. As it turned out, that issue was not timely resolved due, in part, to the designated attorneys' failure to jointly designate a neutral arbitrator and the amount of claimed additional liabilities totaling over $10 million.

Nevertheless, anticipating such eventuality, all of the parties to the transaction, other than WBC, executed a special agreement for the purpose of mitigating the situation which would arise in the event the amount of the residual liabilities of EALC and Macson was not finally arbitrated on or before October 15, 2001. In such event, it was agreed that Iderval would furnish a bank guaranty in the amount of the residual liabilities not arbitrated and thus contested by EALC and Macson; that EALC, as guarantor of the buyer, would make payment of $5,632,062 at the latest on October 1, 2001 to the attorney trust account of counsel for the sellers; and, that the amount of any residual liabilities established by agreement of the mediators would simultaneously be paid by Iderval and Iderval would furnish a bank guaranty in the amount of the residual liabilities not arbitrated by the mediators and thus contested by the sellers.

It is undisputed that none of the payments or guaranties provided for in the special agreement were made by October 15, 2001. However, nothing in the special agreement, which

was enforceable and made an integral part of the various agreements, provides for arbitration of any disputes thereunder and the agreement specifically provides that it is subject to French law and the jurisdiction of the Commercial Court of Paris.

Interrelatedness, standing alone, is not enough to subject a nonsignatory to arbitration (*TNS Holdings v MKI Sec. Corp.*, 92 NY2d 335, 340 [1998]; *Mionis v Bank Julius Baer & Co.*, 301 AD2d 104 [2002]). In effect holding otherwise, the motion court erroneously treated WBC as one of the sellers. While WBC may have been controlled at one time by the principal of the selling corporations and may or may not be still so controlled, there is nothing to warrant ignoring the manner in which the various parties or corporate entities to the transaction have chosen to conduct business. Thus, despite the fact that EALC, a guarantor, was obligated to make payment of the $5,632,062 withheld at the closing to the sellers' attorney's trust account by October 1, 2001, the motion court erroneously found that the special agreement provided that if the binding arbitration was not completed by October 1, 2001, WBC, a nonsignatory to that agreement, was to obtain such guaranty. Thus, it concluded, since WBC never obtained the required guaranty, the buyer's obligations under the lease amendment to release the withheld payment or deliver possession of the leased premises, the precondition to the relief sought by WBC in this action, was not satisfied. Such conclusion, however, ignores the fact that EALC and Iderval, which with Summersun owned EALC, were the only parties obligated to obtain guaranties or pay the withheld $5,632,0632 by October 1, 2001.

Clearly, arbitration was the exception rather than the rule and the intent of the seemingly sophisticated and separate corporate entities involved in the transaction was to resolve any disputes, other than the amount of any additional liabilities of the sellers, by litigation in Paris. Although CPLR 7504 authorizes New York courts to appoint a neutral arbitrator if, as is the case here, the agreed-upon method for selection of an arbitrator fails, none of the contracts containing the agreement to arbitrate the additional liabilities issue provides for recourse to New York courts or law. On the contrary, they provide for all other disputes resulting from or related to such contracts to be resolved by mediation, failing which, the parties agreed to the jurisdiction of the Court of Commerce of Paris. Thus, it would appear that the issue of a court-appointed arbitrator is for the Paris court to determine.

These are sophisticated parties and there is a certain logic to their agreement to arbitrate only the discrete "Additional Li-

abilities" issue, which would only result in an adjustment of the purchase price of the building. All other disputes regarding the purchase, which was effected by the sale of corporate stock, were to be decided in French court according to French law, the only exception being the lease and lease amendment which are governed by New York law with any disputes to be decided in New York, where the building is located.

Although related somewhat to the additional liabilities issue, which the parties to the purchase, other than WBC, agreed to arbitrate, WBC's present claim for specific performance of the lease amendment is not so interrelated as to mandate arbitration of such issue. Regardless of what person or persons controlled the various corporate entities, the New York courts should not rewrite the parties' agreements or impose arbitration contrary to their clear intention otherwise. Thus, although WBC's attempt to enforce the terms of the parties' amendment to their lease should await the outcome of the arbitration of the "Additional Liabilities" issue, that is no reason to compel it to arbitrate its claims under the lease amendment, since it admittedly is not a signatory to any agreement containing a relevant arbitration clause.

Accordingly, the order of the Supreme Court, New York County (Edward Lehner, J.), entered June 26, 2002, which granted defendant landlord's cross motion to dismiss the complaint and compel arbitration, should be reversed, on the law, without costs, defendant's cross motion denied, the complaint reinstated and this action stayed pursuant to CPLR 2201 pending the outcome of the arbitration of the "Additional Liabilities" issue.

NARDELLI, J.P., TOM, SAXE and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered June 26, 2002, reversed, on the law, without costs, defendant's cross motion denied, the complaint reinstated and this action stayed pursuant to CPLR 2201 pending the outcome of the arbitration of the "Additional Liabilities" issue.