PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 09-2514

INVISTA S.À.R.L.; INVISTA TECHNOLOGIES, S.À.R.L.;
INVISTA NORTH AMERICA S.À.R.L.


v.

RHODIA, SA,

Appellant

Appeal from the United States District Court
for the District of Delaware
(Civ. No. 1-08-cv-00941)
District Judge: Hon. Robert B. Kugler

Argued: April 13, 2010

Before: McKEE, *Chief Judge*, HARDIMAN, *Circuit Judge*,
and
RUFE, *District Judge*[*]

---

[*]The Hon. Cynthia M. Rufe, United States District
Judge for the Eastern District of Pennsylvania, sitting by
designation.

1

(Opinion filed: October 25, 2010)

JONATHAN L. GREENBLATT, ESQ.  (Argued)
NEIL KOSLOWE, ESQ.
CHRISTOPHER RYAN, ESQ.
SEAN ARTHURS, ESQ.
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W. , Suite 900
Washington, D.C. 20004
*Attorneys for Appellant*

KATHLEEN M. SULLIVAN, ESQ.  (Argued)
MICHAEL B. CARLINSKY, ESQ.
DANIEL L. BROCKETT, ESQ.
SANFORD I. WEISBURST, ESQ.
QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

JACK B. BLUMENFELD, ESQ.
RODGER D. SMITH II, ESQ.
MORRIS, NICHOLS, ARSHT & TUNNEL LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware 19899
*Attorneys for Appellees*

OPINION

McKEE, *Chief Judge.*

Rhodia, SA, appeals the district court's denial of the motion it filed pursuant to Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, ("FAA"), in which Rhodia asked the district court to dismiss or stay an action filed against Rhodia by Invista S.à.r.l., Invista Technologies, S.à.r.l. and Invista North America S.à.r.l. ("INVISTA").[1]  For the reasons set forth below, we will dismiss Rhodia's appeal because Rhodia's attempt to resolve the underlying dispute through arbitration under the § 3 of the FAA is now moot.

## I. THE UNDERLYING DISPUTE

In the late 1960's, E. I. DuPont de Nemours ("DuPont") developed the "Gen I technology," for manufacturing adiponitrile ("ADN").  ADN is a critical intermediate chemical used in manufacturing nylon. The actual Gen I technology (hereinafter, sometimes referred to as "The Trade Secrets") is contained in various documents including flowsheets, process simulation models, and proprietary design and engineering manuals.  According to INVISTA, these documents contain countless items of proprietary technical information concerning designing, constructing, and safely and efficiently operating an ADN plant.  The information was developed from mathematical modeling and laboratory experiments, as well as the accumulated technical knowledge of many years of operational experience.  According to INVISTA, today, over 40 years after its invention, the Gen I technologies and other butadiene-based

---

[1]Rhodia, SA is a holding company and parent of all the other Rhodia companies and entities involved in this appeal.

ADN technologies offer the promise of hundreds of millions of dollars in annual revenue in the global merchant market for ADN and nylon 6, 6.

Ultimately, the parties decided to enter an arrangement whereby DuPont's French affiliate, E.I. DuPont de Nemours France S.A.S. ("DuPont France"), entered into a joint venture with Société des Usines Chimiques Rhône-Poulenc ("SUCRP"), which is a subsidiary of Rhône-Poulenc S.A. ("Rhône-Poulenc"). The joint venture was called, "Butachimie." The arrangement involved SUCRP designing, building and operating a plant to manufacture ADN using the Gen I technology.

The Butachimie joint venture is governed by the Joint Venture Agreement ("JVA") and a number of ancillary agreements. However, the JVA is the umbrella agreement that spells out the duties and obligations of the parties. Article 9 of the JVA, captioned: "NONDISCLOSURE OF TECHNOLOGY," provides that, absent certain specified exceptions:

> Neither party will disclose to third parties or use, except as otherwise agreed upon, for fifteen (15) years from date of disclosure, confidential information with respect to the production of ADN or ADN hydrogenation disclosed to it by

the other party or by SNC,[3] . . .

JA 199-200.

Article 23 of the JVA contained the arbitration clause that is at the center of this dispute. That clause provides:

> The parties hereto agree that all disputes which may arise in connection with this Agreement should be resolved between them and, when this is not possible, such disputes shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with said Rules, arbitration to be held at Paris, France.  The arbitrators will act as amiable compositeurs.   The decision of the arbitrators will be final. . .

JA 201.  The ancillary agreements governing the joint venture contained similar arbitration clauses, and most of them also contained non-disclosure provisions.

According to INVISTA, the arbitration clause in the JVA applies only to the parties to the JVA, *i.e.*, DuPont France and SUCRP, and not to either entity's parent company or affiliates.

---

[3] "SNC" stands for "société en nom collectif" which means "partnership."

A separate License Agreement served as a technology transfer agreement. It is between DuPont, the technology owner, and DuPont France/SUCRP, i.e., Butachimie – the joint venture. INVISTA contends that DuPont, as the technology owner, licensed the highly confidential Gen I technology (along with other technical information) pursuant to the License Agreement between DuPont and Butachimie.

The License Agreement contains a non-disclosure clause, which provides:

> Except as hereinbefore specifically provided, neither LICENSEE [i.e., Butachimie] nor any Sublicensee shall disclose to any party, furnish to any party any equipment embodying such information or use said information in any manufacturing operations outside of France. The obligations of this paragraph shall continue for fifteen (15) years from the date of receipt by LICENSEE of the particular Confidential DU PONT Technical Information in question.

JA 205. The License Agreement also contains an arbitration clause at Article XVII, which is very similar to the arbitration clause contained in Article 23 of the JVA. The decision of the arbitrators is also to be final under Article XVII of the License Agreement. JA 208.

According to INVISTA, neither Rhodia, S.A. nor any of its affiliates is a party to the License Agreement because DuPont only intended a license for the Butachimie joint

6

venture. Thus, all transfers of technology from DuPont were intended only for the sole benefit of Butachimie and not for any Rhodia entity.

In 1975, SUCRP merged with another entity to become Rhône-Poulenc Industrialization ("RPI"). In 1997, the parent company, Rhône-Poulenc S.A., transferred its chemical and specialties business (including RPI) to the Rhodia Group, which is directed by Rhodia S.A. RPI's interest in the Butachimie joint venture was ultimately transferred to a single Rhodia S.A. subsidiary, Rhodianyl.

In 2002, DuPont decided to sell its Textiles and Interiors Business ("DTI") to affiliates of the company now known as INVISTA. In 2004 those affiliates purchased DTI, including the Gen I technology and other "know-how" related to the manufacture of ADN, for approximately $4 billion. INVISTA contends that in two agreements governing the transaction, the Purchase and Sale Agreement ("PSA") and the Patent and Technical Information Agreement ("PTIA"), DuPont promised INVISTA, *inter alia*, that it would not compete with INVISTA in the manufacture of ADN until April 30, 2011, and that it would maintain the confidentiality of the Trade Secrets being transferred to INVISTA. As part of the transaction, KoSa France Holding S.à.r.l, an INVISTA affiliate, acquired DuPont France's interest in Butachimie. INVISTA claims that, as a result of its purchase of DTI, it now owns the Gen I technology.

On September 19, 2006, INVISTA announced that it had "begun engineering activities to construct a world-scale nylon 6,6 facility in Asia to support the region's growing demand for

7

[ADN] . . . and nylon 6,6 polymer." JA 127. INVISTA also announced that the new facility would deploy its "proprietary, next generation of butadiene-based ADN technology to expand its low-cost, competitively advantaged position in Asia." *Id*.

INVISTA notes that less than one week after its announcement, Rhodia, S.A. announced that it too was "studying the feasibility of building an [ADN] plant in Asia." JA 127. However, according to INVISTA, Rhodia, S.A. has not acquired a license for any butadiene-based ADN manufacturing technology comparable to INVISTA's proprietary and confidential Gen I technology, and Rhodia, S.A. could not develop a comparable technology on its own without a substantial expenditure of resources, time, and money. Accordingly, INVISTA claims that Rhodia, S.A. could proceed with its announced plans only by misappropriating the Gen I technology Trade Secrets it learned through the Butachimie joint venture and/or if DuPont (the originator of the technology and assignor of it to INVISTA) had unlawfully disclosed the Trade Secrets to Rhodia, S.A.

## II. THE INTERNATIONAL ARBITRATION

On October 3, 2007, Rhodianyl, then the Butachimie joint venture partner and party to the JVA, and Rhodia Operations S.A.S., an entity which purportedly provides services to Butachimie, initiated arbitration, pursuant to Article 23 of the JVA against INVISTA-affiliated entities, INVISTA S.à.r.l. INVISTA North America S.à.r.l.and KoSa France Holding S.à.r.l, before an Arbitration Tribunal of the International Chamber of Commerce or "ICC" (the "Tribunal").

8

Shortly thereafter, the Rhodia claimants added Rhodia, S.A. as a named party.[4] The Rhodia parties asked the Tribunal for a declaratory ruling that they (the Rhodia parties) have a right to use confidential information that was disclosed to the Butachimie joint venture more than 15 years ago pursuant to confidentiality provisions contained in Article 9 of the JVA.

The Rhodia parties asked the arbitration Tribunal to determine their rights under the Joint Venture Agreement and rule on their right to use approximately 11,600 documents that Rhodia claims were disclosed to Butachimie more than 15 years ago. The INVISTA respondents submitted counterclaims against the Rhodia parties seeking, "[a] permanent injunction . . . preventing Rhodianyl and, derivatively, any entity in the Rhodia Group . . . from, anywhere in the world sing, transferring, or benefitting from the Gen I technology." JA 410.

The INVISTA parties also argued that the Tribunal lacked jurisdiction over Rhodia S.A., Rhodia Operations S.A.S., Invista S.à.r.l., and Invista North America S.à.r.l., because they had not signed the JVA.

On July 2, 2009, the Tribunal completed a two-week evidentiary hearing on the INVISTA parties' challenges to jurisdiction as well as the Rhodia parties' claim that it has the right to use confidential technical information under Article 9

---

[4]INVISTA contends that Rhodia initiated the arbitration in an attempt to preempt it from taking legal action against Rhodia.

of the JVA.  Thereafter, the Tribunal issued a Partial Award that included four findings relevant to its jurisdiction as well as the issue before us:

**(1). The Tribunal held that it did not have jurisdiction over Rhodia S.A.**

The Tribunal explained:

The RHODIA S.A. company holds all of the shares of RHODIANYL.  There is no doubt that RHODIA S.A. has had a direct interest in the activity of BUTACHIMIE to the extent that the latter substantially supplies it with ADN.

This finding is not sufficient, however, to infer the consent of RHODIA S.A. to the arbitration clause.  In fact, documents produced on the record do not show that RHODIA S.A. was directly involved in the performance of the Joint Venture Agreement. . . .

Consequently, the Arbitral Tribunal does not have jurisdiction with regard to RHODIA S.A.

Partial Award, ¶ 210;

**(2)  The Tribunal did not have jurisdiction over Invista North America S.à.r.l.**

The Tribunal explained:

10

INVISTA NORTH AMERICA does not appear to have been involved (directly) in the performance of the Joint Venture Agreement and in the activity of BUTACHIMIE. The [Rhodia parties] do not claim otherwise. They limit themselves to mentioning that INVISTA NORTH AMERICA is concerned with the rights and obligations arising out of the Joint Venture Agreement as well as with the disputed questions that are the object of the present proceeding.

In the absence of elements showing that INVISTA NORTH AMERICA substantially participated in the performance of the Joint Venture Agreement, the Arbitral Tribunal declares that it does not have jurisdiction with regard to that company.

Partial Award, ¶ 208;

**(3) The Tribunal determined that it did have jurisdiction over Invista S.à.r.l.**

The Tribunal explained:

As regards the INVISTA SARL company, according to various minutes of shareholders meetings of BUTACHIMIE, representatives of that company have on numerous occasions since April 2004 participated in shareholder meetings. . . .

11

Despite the fact that the minutes do not mention in what capacity the representatives of INVISTA SARL participated in the shareholders meetings, the involvement of that company in the activity of BUTACHIMIE, starting with the performance of the Joint Venture Agreement, cannot be denied. . . .

The consistent presence of its representatives therefore well demonstrates the intention of INVISTA SARL to be present at the meetings of BUTACHIMIE. . . .

Furthermore, the presence of representatives of the [Rhodia parties] as "observers" in no way rules out the fact that they had been "present." First of all, said representatives were regularly "admitted to the meeting." Then, the minutes establish in a significant way that the "representatives" of INVISTA had different responsibilities within BUTACHIMIE.

It is, therefore, necessary to consider that INVISTA SARL was directly involved in the performance of the Joint Venture Agreement and the Arbitral Tribunal does hold that it has jurisdiction with regard to the latter.

Partial Award, ¶ 209;

**(4). The Tribunal did have jurisdiction over Rhodia**

12

**Operations S.A.S.**.

> The Tribunal opined:
>
> Despite the fact that the minutes do not mention in what capacity RHODIA POLYAMIDE INTERMEDIATES S.A.S. and then RHODIA OPERATIONS S.A. participated in the shareholders meetings [of Butachime], their involvement in the activity of BUTACHIMIE cannot be denied. In fact, it is to be considered that their participation in all those shareholders meetings for at least four years demonstrates a substantial involvement of those companies in the activity of BUTACHIMIE, which the partners once again had desired by inviting them to systematically take part in those meetings.
>
> As stated, given the object of the agreement at issue, a regular attendance of the meetings of BUTACHIMIE necessarily implies a participation in the execution of the Joint Venture Agreement.
>
> Consequently, the Arbitral Tribunal holds that RHODIA OPERATIONS S.A. participated in the performance of the Joint Venture Agreement. It therefore considers that is has jurisdiction with regard to that company.

Partial Award, ¶ 211.

In addressing the merits of the arbitration dispute, the Tribunal did not give the Rhodia parties any rights to use or disclose any of the 11,600 documents in question, or any Gen I technical information in general. However, in the Partial Award, the Tribunal appeared to hold that Article 9 of the Joint Venture Agreement governed the use and disclosure not only of commercial information but also Gen I technical information. *See* Partial Award, ¶ 254. It also held that Article 9 of the Joint Venture Agreement was clear that it imposed a fifteen year limit of confidentiality on disclosure of information, after which the parties are free to use confidential information as they see fit. *Id*. at ¶ 268. Finally, the Tribunal stated: "What remains to be looked into is at what time the said 15-year period commences." *Id*. Accordingly, rulings on the Rhodia parties rights to use or disclose specific documents and information will not occur until a later date. To that end, another hearing has been set for October 2010. The Tribunal's ruling on those issues is not expected until sometime in 2011.

## IV. COURT PROCEEDINGS

Six days after the Rhodia parties initiated the international arbitration, Invisata S.à.r.l sued Rhodia in state court in Texas alleging misappropriation of trade secrets, unfair competition and conversion.[5] According to Rhodia, S.A. the

---

[5]INVISTA submits that it filed suit in Texas because many of the Trade Secrets at issue had been developed by DuPont and INVISTA in Texas, and DuPont built the first operating ADN plant in Texas using the Gen I technology, a

14

Trade Secrets at issue in the Texas litigation are the same as those in the arbitration before the Tribunal. Rhodia, S.A. removed the case from the Texas court to the District Court for the Eastern District of Texas pursuant to 9 U.S.C. § 205. Thereafter, Rhodia moved to dismiss the suit or stay it in favor of the still ongoing arbitration.

INVISTA claims that it voluntarily dismissed the Texas district court action and filed a new action, along with Invista North America S.à.r.l and Invista Technologies S.à.r.l, in the United States District Court for the Southern District of New York. That suit was brought against both Rhodia, S.A. and DuPont.[6]

The district court in New York granted Rhodia, S.A.'s motion to dismiss for lack of subject matter jurisdiction. *INVISTA S.à.r.l v. E.I. duPont de Nemours & Co.*, 2008 WL 4865208 (S.D.N.Y. Nov. 3, 2008). However, the district court allowed INVISTA to amend its complaint and thereby drop Rhodia, S.A. as a defendant so that it could invoke diversity jurisdiction as to DuPont. *Id*. at *5. The district court did not address Rhodia, S.A.'s alternative motion to compel arbitration.

---

plant that INVISTA operates to this day.

[6] INVISTA purportedly did this for reasons of efficiency and convenience that favored suing DuPont and Rhodia, SA in a single forum, and because INVISTA's PSA and PTIA agreements with DuPont mandate a New York forum for dispute resolution.

15

Thereafter, INVISTA (Invista S.à.r.l., Invista Technologies, S.à.r.l. and Invista North America S.à.r.l.) filed an action against Rhodia, S.A. in the Court of Chancery of the State of Delaware, alleging various claims under state law pertaining to misappropriation of trade secrets, interference with contract and unfair competition. INVISTA's complaint alleges that: "[t]his litigation raises separate and distinct issues and claims from those raised in the arbitration." Compl. ¶ 9 (JA 39).

Rhodia, SA removed the case from Delaware Chancery Court to the United States District Court for the District of Delaware pursuant to 9 U.S.C. § 205, and then filed a motion asking that court to either dismiss or stay the litigation in favor of arbitration, pursuant to 9 U.S.C. § 3 or the court's discretionary authority to enter a stay.

The district court denied the motion. *Invista S.à.r.l v. Rhodia S.A.*, 2009 WL 1439407 (D. Del. May 20, 2009). The court refused a stay based upon its determination that "Invista may not be bound by the arbitration provision of the JVA." *Id*. at *3. The district court reasoned that INVISTA may not be bound to the JVA's arbitration clause because INVISTA was not a signatory to the JVA or any of the other agreements containing an arbitration clause. In addition, the court concluded that equitable doctrines that might otherwise bind a non-signatory to an agreement did not apply because INVISTA had neither exploited nor directly benefitted from the JVA. Accordingly, INVISTA could not be held to the provisions of the JVA. *Id*. at *4-5.

16

The district court refused to grant a discretionary stay because Rhodia, SA had not established the "exceptional circumstances" required for that relief. *Id*. at *5. This appeal followed.

## V. APPLICABLE LEGAL PRINCIPLES

"The Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*. ("FAA"), creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." *Century Indemnity Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009) (citation omitted). "Congress designed the FAA to overrule the judiciary's longstanding reluctance to enforce agreements to arbitrate and its refusal to put such agreements on the same footing as other contracts, and in the FAA expressed a strong federal policy in favor of resolving disputes through arbitration." *Id*. (citations omitted). "In particular, the FAA provides that as a matter of federal law '[a] written provision' in a maritime or commercial contract showing an agreement to settle disputes by arbitration 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or equity for the revocation of any contract.'" *Id*. (quoting 9 U.S.C. § 2).

The FAA's second chapter, 9 U.S.C. §§ 201-208, implements the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, *reprinted in* 9 U.S.C. § 201 (historical and statutory notes) ("New York Convention") *Id*. at 522-23 (citations omitted). "Pursuant to this chapter, arbitration agreements fall within the

17

New York Convention if they arise from commercial, legal relationships, such as commercial contracts, except when those relationships are entirely between United States citizens and otherwise are domestic in nature." *Id*. at 523 (citing 9 U.S.C. § 202). "Actions under the New York Convention are deemed to arise under the laws and treaties of the United States." *Id*. (citing 9 U.S.C. § 203).

"The FAA empowers district courts to compel arbitration in accordance with agreements and to enforce awards falling within the New York Convention." *Id*. (citing 9 U.S.C. § 206 and § 207 respectively). "The domestic FAA applies to actions brought under the New York Convention to the extent that the two are not in conflict." *Id*. (citations omitted). "The strong federal policy favoring arbitration applies with special force in the field of international commerce." *Id*. (citation omitted).

"The strong federal policy favoring arbitration, however, does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute." *Id*. "Before compelling a party to arbitrate pursuant to the FAA, a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Id*. (citation omitted). "This determination applies equally in domestic and international arbitration contexts." *Id*. (citation omitted).

"Because an arbitrator's authority derives solely from the parties' agreement to submit their disputes to arbitration, a party cannot be compelled to submit a dispute to arbitration unless it has agreed to do so." *Id*. at 523-24 (citations omitted).

In determining if partes "have agreed to arbitrate, we apply ordinary state-law principles that govern the formation of contracts." *Id*. at 524 (citation and internal quotation marks omitted). "These principles must govern contracts generally; a state law-principle that takes its meaning from the fact that an agreement to arbitrate is at issue does not comport with section 2 of the FAA and therefore is preempted." *Id*. (citations omitted).

As our abbreviated recitation of the district court's holding suggests, non-signatories may be bound to arbitration agreements under certain very limited circumstances. "[A] non-signatory cannot be bound to arbitrate unless it is bound under traditional principles of contract and agency law to be akin to a signatory of the underlying agreement." *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) ("*DuPont*") (citation omitted). "There are five theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel." *Trippe Manufacturing Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). Rhodia, SA claims that estoppel and assumption both apply here and INVISTA should therefore be required to arbitrate even though it is not a signatory to any agreements containing an arbitration clause.

Estoppel can bind a non-signatory to an arbitration clause when that non-signatory has reaped the benefits of a contract containing an arbitration clause. *See Thomson-CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 778 (2d Cir.

19

1995). This prevents a non-signatory from "cherry-picking" the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause). *See, e.g., American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999).

In addition, non-signatories may assume the obligations contained in an arbitration clause where there is a sufficiently close relationship to justify doing so, and the circumstances warrant that result. *See Thomson-CSF, S.A.*, 64 F.3d at 779.[7] In *Thomson-CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773 (2d Cir. 1995), the court explained that a non-signatory may be bound by an arbitration clause "if its subsequent conduct indicates that it is assuming the obligation to arbitrate." *See Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir.) (flight attendants manifested a clear intention to arbitrate by sending a representative to act on their behalf in arbitration process), *cert. denied*, 502 U.S. 910 (1991).

**VI. DISCUSSION**

Rhodia, SA contends that three INVISTA entities who are the plaintiffs in this litigation – all of whom are non-

_____

[7] When this occurs, in essence, a non-signatory voluntarily pierces its own veil to arbitrate claims against a signatory that are derivative of its corporate-subsidiary's claims against the same signatory. *Grigson v. Creative Artists Agency, L.L.C.*, 201 F.3d 524, 527 (5th Cir. 2000).

signatories to the JVA containing the arbitration clause – can each be compelled to arbitrate the claims they asserted against Rhodia S.A. in the district court. Although Rhodia S.A. correctly notes that non-signatories can be compelled to arbitrate under the doctrines of equitable estoppel and/or assumption, the argument overlooks the rather crucial fact that Rhodia did not sign any agreement to arbitrate the claims either.

Not surprisingly, Rhodia, SA offers no authority for its contention that a non-signatory to an arbitration agreement can compel another non-signatory to arbitrate certain claims, and we have found none. However, we need not attempt to navigate the uncharted waters churned up by Rhodia's novel argument because the Tribunal's Partial Award renders Rhodia's appeal moot.

On January 13, 2010, the Tribunal issued a Partial Award. It ruled, *inter alia*, that it lacked jurisdiction over Rhodia, SA. The Tribunal ruled that Rhodia, SA has a direct interest in the Butachimie joint venture because Butachimie "substantially supplies it with ADN." Partial Award ¶ 210. However, the Tribunal determined that Rhodia, SA's interest in Butachimie "is not sufficient . . . to infer the consent of RHODIA SA to the arbitration clause." *Id*.

"[A]n appeal will be dismissed as moot when events occur during [its] pendency . . . which prevent the appellate court from granting any effective relief." *Gen. Elect. Co. v. Cathcart*, 980 F.2d 927, 934 (3d Cir. 1992) (citation omitted). Dismissal is necessary in those circumstances because appellate courts "do not have jurisdiction to hear a case that cannot affect

21

the rights the appellant wishes to assert." *Salovaara v. Jackson Nat'l Life Ins. Co.*, 246 F.3d 289, 296 (3d Cir. 2001).

In *Salovaara*, we explained that "[i]f events occur after the filing of a notice of appeal that moot the issues presented, then there is no remaining justiciable controversy." *Id.* In *Salovaara*, we were not able to grant the requested relief against one of the parties because a settlement agreement was reached after suit was filed. *Id.* The Partial Award that was entered by the Tribunal has exactly the same effect here. Rhodia S.A.'s claim that it is entitled to arbitration has been rejected by the entity Rhodia S.A. asked the district court to defer to in its motion to dismiss or stay litigation in favor of arbitration. Thus, the Tribunal's holding that it does not have jurisdiction over Rhodia, SA moots this appeal. Given the Tribunal's ruling, it is now clear that the district court could not have enforced the arbitration clause as Rhodia, SA had urged.

"The purpose of the FAA is to render agreements to arbitrate fully enforceable." *Mendez v. Puerto Rican International Companies, Inc.*, 553 F.3d 709, 711 (3d Cir. 2009). Courts lack power to grant relief under the FAA unless there is an enforceable contractual right to arbitrate on the part of the moving party. *See Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999). As we have explained, "[a]rbitration is strictly a matter of contract. If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so," absent circumstances that would justify applying one or more of the equitable doctrines we have mentioned. *Id.*

As we have explained above, the threshold inquiry under

22

§ § 3 and 4 of the F A A[8]

---

[8]Section 3 of the FAA provides as follows:

§3. Stay of proceedings where issue therein referable to arbitration

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 4 of the FAA provides:

§ 4. Failure to arbitrate under agreement; petition to United

23

States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the

24

failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues

25

whether, under traditional contract law principles, an agreement to arbitrate is enforceable between the parties. *See, e.g., Arthur Andersen LLP v. Carlisle*, __ U.S. __, 129 S.Ct. 1896, 1902 (2009) ("If a written arbitration provision is made enforceable against (or for the benefit of) a third party under state contract law, [§ 3's] terms are fulfilled.); *DuPont*, 269 F.3d at 194 ("a non-signatory cannot be bound to arbitrate unless it is bound under traditional principles of contract and agency law to be akin to a signatory under the underlying agreement.") (citation

to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

9 U.S.C. § 4.

26

and internal quotation marks omitted).

The inquiry is the same for motions under §§ 3 and 4, *viz.*, the inquiry is whether an enforceable agreement to arbitrate exists. *See, e.g., Zosky v. Boyer*, 856 F.2d 554, 556 (3d Cir. 1988). ("[I]t makes no practical difference whether the court enters an order in an ongoing suit compelling arbitration or merely stays its own proceedings. In either event, arbitration is the *sine qua non* before proceeding."), *abrogated on other grounds by Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000).

The Tribunal's holding that it has no jurisdiction over Rhodia, SA means that Rhodia, SA is a stranger to the ICC Arbitration and, therefore, has no enforceable right of arbitration. Because Rhodia, SA has no right to arbitration, it cannot obtain relief under §§ 3 or 4 of the FAA, and its appeal from the district court's denial of its motion to dismiss/stay under § 3 of the FAA must therefore be dismissed as moot, because a court can not award it the relief it seeks. It simply can not arbitrate the disputed claims given the Tribunal's decision.

Moreover, because Rhodia, SA's appeal from the denial of its motion to dismiss under § 3 is moot and must be dismissed, Rhodia, SA's appeal from the district court's denial of its discretionary motion to stay must also be dismissed for lack of pendent appellate jurisdiction. There is no jurisdiction for the court's pendent jurisdiction to attach to.

Section 16(a)(1)(A) of the FAA, 9 U.S.C. § 16(a)(1)(A) initially gave us jurisdiction over Rhodia's appeal from the

27

district court's order denying Rhodia's motion for a mandatory stay under § 3 of the FAA. However, "the denial of a stay based on an exercise of the district court's discretion, as opposed to the denial of a mandatory stay based on a failure to meet the requirements of Section 3, would be a non-final order over which we would have no jurisdiction." *Mendez v. Puerto Rican International Companies, Inc.*, 553 F.3d at 714 n.3.

Nonetheless, a court of appeals can, in certain cases, exercise pendent appellate jurisdiction over issues not otherwise appealable. "The doctrine of pendent appellate jurisdiction, in its broadest formulation, allows an appellate court in its discretion to exercise jurisdiction over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and independently exercises its jurisdiction." *DuPont*, 269 F.3d at 202-03 (citations omitted). However, the doctrine should be used "sparingly" and "only where there is a sufficient overlap in the facts relevant to both the appealable and nonappealable issues to warrant *plenary* review." *Id.* at 203.

"[T]he exercise of pendent appellate jurisdiction requires, at the very least, that the orders from which the appeals are taken be 'inextricably intertwined.'" *Bowers v. National Collegiate Athletic Ass'n*, 346 F.3d 402, 412 (3d Cir. 2003). Issues are "inextricably intertwined" only when the appealable issue "cannot be resolved without reference to the otherwise unappealable issue." *American Society for Testing & Materials v. Corrpro Companies, Inc.*, 478 F.3d 557, 580-81 (3d Cir. 2007) (citations omitted). In addition, "pendent appellate jurisdiction over an otherwise unappealable order is available

28

only to the extent necessary to ensure meaningful review of an appealable order." *In re Montgomery County*, 215 F.3d 367, 375-76 (3d Cir. 2000).

Thus, even assuming *arguendo* that we once had pendent appellate jurisdiction over the district court's denial of Rhodia, SA's motion for a discretionary stay, we no longer have such jurisdiction. The appeal from the district court's denial of the motion for a stay under the § 3 of the FAA is now moot, and there is no longer any properly appealable order before us. Therefore, there can be no pendent appellate jurisdiction over the order denying the motion for a discretionary stay. Accordingly, the appeal from the order denying the motion for a discretionary stay must be dismissed for lack of pendent appellate jurisdiction.

## V.  CONCLUSION

For all of the above reasons, we will dismiss the Rhodia, SA's appeal from the order denying the motion for a stay under 9 U.S.C. § 3 as moot and dismiss Rhodia, SA's appeal from the order denying the motion for a discretionary stay for lack of pendent appellate jurisdiction.