Order, Supreme Court, New York County (Eileen Bransten, J.), entered February 3, 2011, which denied defendants’ motion to the extent that it sought to compel arbitration and dismiss the fraud and fraudulent concealment causes of action or, in the alternative, to stay the action pending a simultaneously commenced Texas arbitration, and which granted the motion to dismiss with respect to the breach of fiduciary duty causes of action, unanimously modified, on the law, to the extent of reinstating plaintiffs’ causes of action for breach of fiduciary duty, dismissing the fraud and fraudulent concealment causes of action, and granting the motion to stay the action, and otherwise affirmed, without costs.
The facts gleaned from the first amended complaint (the complaint) are as follows. Elaintiff Oxbow Carbon LLC (Oxbow Carbon) is the immediate parent and sole owner of plaintiff Oxbow Calcining USA Inc. (Oxbow USA), formerly known as *647 Great Lakes Carbon USA Inc. (GLC USA). Oxbow USA, through its subsidiary, nonparty Oxbow Calcining LLC (Oxbow LLC), the arbitration claimant, formerly known as Great Lakes Carbon LLC (GLC LLC), owns and operates a calcining plant in Port Arthur, Texas.
Defendants Rogers and Bingham are former directors of GLC USA and principals of defendant American Industrial Partners (AIP). Defendants American Industrial Partners Capital Fund II, L.P (AIP Fund II) and American Industrial Partners Capital Fund III, L.P (AIP Fund III) are affiliates of AIP In or about 1998, Aip through AIP Fund II, acquired all of the stock of GLC USA and its subsidiaries, which the complaint refers to collectively as GLC.
The calcining process emits large amounts of waste heat, which can be converted to steam. Adjacent to the calcining plant is a steam plant that Dynergy Power Corp. (Dynergy) owned and operated until sometime in 2000. Pursuant to an agreement between GLC and Dynergy, waste heat was transferred from the calcining plant’s kilns to the steam plant and used to heat generators that produced steam and electricity for sale to end users. The release of flue gas from both the calcining plant’s kiln stacks and the steam plant’s boiler stack was conducted pursuant to regulatory permits issued to GLC.
In 2000, GLC purchased the steam plant from Dynergy. Before operations could resume, the plant required refurbishment, including the installation of a new pollution control system, which GLC could not fund.
In 2003, AIP sold a portion of its interest in GLC to the Great Lakes Carbon Income Fund (GLC Income Fund), but continued to hold a controlling interest. In 2004, two competing offers for the purchase of the steam plant and the transfer of waste heat from the calcining plant were submitted to GLC. One was from Cinergy and the other from Aip which, along with another entity, formed nonparty Port Arthur Steam Energy LP (PASE), the arbitration respondent, for that purpose. Because GLC’s AIP directors were conflicted, GLC appointed an independent committee of non-AIP directors to review the competing proposals.
In November 2004, to obtain the committee’s approval, Aip with the knowledge of the individual defendants, represented, as had Cinergy, that it would install electrostatic precipitators in its new pollution control system. Based on defendants’ knowledge of GLC, and defendants’ representations that AIP would fully protect the interests of GLC and its shareholders, the committee agreed to accept AIP’s proposal. However, AIP soon ad *648 vised GLC that it would probably be worth installing a magnesium hydroxide injection and multicone pollution control system, which was less expensive and would enable operations to commence sooner. To induce GLC to agree, AIP represented that it would install an effective system at AIP’s expense if the injection system failed, and that GLC would never have any monetary liability for the requirement to supply waste heat to PASE. Relying on these representations, GLC sold the steam plant to EASE for $1 and, effective February 25, 2005, entered into a Heat Exchange Agreement (HEA) with PASE whereby PASE agreed to process all waste heat and flue gas from the calcining plant.
In 2005, AIP sold another portion of its interest in GLC to the GLC Income Fund. In 2006, it sold its remaining interest to Rain Commodities (USA) Inc., an unafflliated third party. In or about May 2007, Oxbow Carbon, LLC purchased the stock of GLC.
Plaintiffs allege that AIP’s inadequate injection system, and installation of unlined carbon steel boiler stacks, resulted in excessive and rapid corrosion, causing the stacks to fail. After AIP/PASE refused to fix the problems, Oxbow USA had to fix them, at a cost estimated to be between $6 million and $9 million. Towards this end, Oxbow USA installed a “cooler bag-house” (an added pollution control system), replaced corroded boiler stacks, and retained experts to conduct testing.
On July 16, 2010, Oxbow LLC demanded arbitration in Texas of claims against PASE for breach of the HEA and related duties. Simultaneously, plaintiffs commenced this action alleging that defendants, as former directors and controlling shareholders of GLC, engaged in fraud before and during the sale of the steam plant to PASE and breached their fiduciary duty to GLC and its shareholders. Plaintiffs also alleged that defendants concealed the material risks created by the inferior pollution control system, causing Oxbow Carbon to overpay for GLC. Shortly after the complaint was filed, defendants moved, inter alia, to compel arbitration.
The Federal Arbitration Act reflects a strong public policy favoring arbitration, a policy New York courts have also promoted (see Matter of Smith Barney Shearson v Sacharow, 91 NY2d 39, 48 [1997]; Matter of Miller, 40 AD3d 861, 861 [2007]). Nevertheless, “the obligation to arbitrate . . . remains a creature of contract” (Louis Dreyfus Negoce S.A. v Blystad Shipping & Trading Inc., 252 F3d 218, 224 [2d Cir 2001], cert denied 534 US 1020 [2001]), and parties may structure arbitration agreements to limit both the issues they choose to arbitrate and *649 “with whom they choose to arbitrate their disputes” (Stolt-Nielsen S.A. v AnimalFeeds Intl. Corp., 559 US —, 130 S Ct 1758, 1774 [2010]). Where, as here, “the parties dispute not the scope of an arbitration clause but whether an obligation to arbitrate exists,” the general presumption in favor of arbitration does not apply (Applied Energetics, Inc. v NewOak Capital Mkts., LLC, 645 F3d 522, 526 [2d Cir 2011]; see also Matter of Miller, 40 AD3d at 862).
Guided by these principles, we find that Supreme Court correctly denied defendants’ motion to compel arbitration. Neither plaintiffs nor defendants are signatories to the agreement to arbitrate. While the arbitration provision in the HEA is broad, covering “[e]very dispute of any kind or nature between the Parties arising out of or in connection with this Agreement,” the HEA defines the term “Parties” as GLC LLC, now Oxbow Calcining USA Inc, and PASE, the arbitration claimant and respondent.
Nor are plaintiffs subsidiaries of or the successors in interest to GLC LLC. Although they are the grandparent and parent companies to Oxbow LLC, which is the successor to GLC LLC, ‘ ‘ [i]nterrelatedness, standing alone, is not enough to subject a nonsignatory to arbitration” (World Bus. Ctr. v Euro-American Lodging Corp., 309 AD2d 166, 171 [2003], citing TNS Holdings v MKI Sec. Corp., 92 NY2d 335, 340 [1998]). A parent corporation’s complete ownership of a subsidiary’s stock is also insufficient, by itself, to pierce the corporate veil (see De Jesus v Sears, Roebuck & Co., Inc., 87 F3d 65, 69 [2d Cir 1996], cert denied 519 US 1007 [1996]; Thomson-CSF, S.A. v American Arbitration Assn., 64 F3d 773, 780 [2d Cir 1995] [“Anything short of requiring a full showing of some accepted theory under agency or contract law imperils a vast number of parent corporations”]).
Defendants contend that the nonsignatory plaintiffs must arbitrate under an estoppel theory. However, there is little authority for enforcing an arbitration provision between two nonsignatories (see Invista S.A.R.L. v Rhodia, S.A., 625 F3d 75 [3d Cir 2010]; American Personality Photos, LLC v Mason, 589 F Supp 2d 1325, 1331 [SD Fla 2008]; Amstar Mtge. Corp. v Indian Gold, LLC, 517 F Supp 2d 889, 900 [SD Miss 2007]). Even if estoppel may be raised in this situation, a nonsignatory may be estopped from avoiding arbitration where it “knowingly accepted the benefits of an agreement with an arbitration clause” (MAG Portfolio Consultant, GMBH v Merlin Biomed Group LLC, 268 F3d 58, 61 [2d Cir 2001] [internal quotation marks omitted]). The benefits must be direct, and the party *650 seeking to compel arbitration must demonstrate that the party seeking to avoid arbitration relies on the terms of the agreement containing the arbitration provision in pursuing its claim (see Matter of SSL Intl., PLC v Zook, 44 AD3d 429 [2007]; American Bur. of Shipping v Tencara Shipyard S.P.A., 170 F3d 349, 353 [2d Cir 1999]). Here, plaintiffs did not assume performance of the HEA and did not derive a direct benefit therefrom. Rather, plaintiffs are suing defendants in their capacity as former fiduciaries of GLC who allegedly fraudulently misrepresented facts and engaged in self-dealing. Accordingly, plaintiffs are not equitably estopped from avoiding the agreement’s obligation to arbitrate.
Arbitration of the claims against the individual defendants is not required, since the alleged misconduct does not relate to their behavior as officers, directors, or agents of PASE, the other signatory to the agreement, but, rather, to their behavior as former directors of GLC USA (see Hirschfeld Prods. v Mirvish, 88 NY2d 1054 [1996]).
The fraud claim should have been dismissed since it merely alleges an intent not to perform future contractual obligations (see New York Univ. v Continental Ins. Co., 87 NY2d 308, 318 [1995]; Pacnet Network Ltd. v KDDI Corp., 78 AD3d 478 [2010]; Fletcher v Boies, Schiller & Flexner, LLP, 75 AD3d 469, 470 [2010]).
The fraudulent concealment claim should also have been dismissed. To state a claim for fraudulent concealment, a plaintiff must allege: (1) that the defendant had a duty to disclose certain material information but failed to do so; (2) that the defendant then made a material misrepresentation of fact; (3) that said misrepresentation was made intentionally in order to defraud or mislead; (4) that the plaintiff reasonably relied on said misrepresentation; and (5) that the plaintiff suffered damage as a result (see IDT Corp. v Morgan Stanley Dean Witter & Co., 63 AD3d 583, 586 [2009]). Plaintiffs failed to allege that, at the time of the subject transactions, they were known parties that could be expected to rely on defendants’ representations or omissions (see e.g. Sykes v RFD Third Ave. 1 Assoc., LLC, 15 NY3d 370 [2010]; Swersky v Dreyer & Traub, 219 AD2d 321, 326 [1996]). They alleged conclusorily that defendants intended to cause them harm, based on a possibility that the injection system might fail some day. However, former directors of a company do not owe a duty to disclose information to future, unknown purchasers.
Supreme Court erred in dismissing plaintiffs’ breach of fiduciary duty claims as time-barred under CPLR 202 at this *651 procedural stage. Where a nonresident brings a cause of action that accrued outside of New York, CPLR 202 applies, and the action must be timely in both New York and the other jurisdiction (Global Fin. Corp. v Triarc Corp., 93 NY2d 525, 528 [1999]). “When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss” (id. at 529). In the case of a corporate plaintiff, that may be the state of incorporation or its principal place of business (id. at 529-530; see also Kat House Prods., LLC v Paul, Hastings, Janofsky & Walker, LLP, 71 AD3d 580, 580-581 [2010]; Brinckerhoff v JAC Holding Corp., 263 AD2d 352, 353 [1999]). Plaintiffs allege that Oxbow USA is a Delaware corporation formerly known as GLC USA, doing business in New York and Texas and “formerly having its principal place of business at 551 Fifth Avenue,” with its current principal place of business in Florida; that the causes of action set forth arose in New York; and that from August 2003 until 2005, AIP and GLC’s [GLC USA and its subsidiaries] offices were located in New York. Read together, these allegations, if proven, would establish that plaintiffs’ principal office was in New York when the cause of action accrued. Defendants did not submit documentary evidence that would conclusively disprove these allegations (see e.g. Romanelli v Disilvio, 76 AD3d 553, 554 [2010]). Any ruling on whether the borrowing statute applies would require a factual determination as to the principal residency of GLC USA and its subsidiaries, which is inappropriate on motion to dismiss (see e.g. United Bhd. of Carpenters & Joiners of Am. v Nyack Waterfront Assoc., 212 AD2d 778 [1995]).
Verizon Directories Corp. v Continuum Health Partners, Inc. (74 AD3d 416 [2010], lv denied 15 NY3d 716 [2010]) is inapposite. In Verizon, we rejected the plaintiffs contention that it was a resident of New York, or that its cause of action accrued in this State, by virtue of its authorization to do business and asserted extensive presence here. Verizon did not claim that its principal office was in New York.
Accordingly, the motion to dismiss the breach of fiduciary duty cause of action as time-barred under the borrowing statute is premature and is denied without prejudice to renewal after further discovery. Should it be determined on renewal that the borrowing statute does not apply, the claims on behalf of Oxbow USA against the individual defendants in their capacities as directors of GLC will be governed by the six-year statute of limitations of CPLR 213 (7), which applies to actions for breach of fiduciary duty by or on behalf of a corporation against a present or former corporate director or officer (see Sardanis v Sumitomo *652 Corp. 279 AD2d 225, 230 [2001]; see also Matter of Skorr v Skorr Steel Co., Inc., 29 AD3d 594 [2006]; Toscano v Toscano, 285 AD2d 590 [2001]). “CPLR 213 (7) applies to all ‘action[s],’ with no differentiation between legal-and equitable claims” (Roslyn Union Free School Dist. v Barkan, 16 NY3d 643, 650 [2011]).
As to the AIP defendants, “where an allegation of fraud is essential to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations under CPLR 213 (8)” (IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 139 [2009]). Here, the essence of plaintiffs’ claim is that AH] as the holder of a controlling interest in GLC, breached its fiduciary duty to ensure that any self-dealing transaction between GLC and PASE would be entirely fair to GLC and its shareholders, by employing bait-and-switch tactics and making numerous misrepresentations to GLC’s independent committee and management in order to fraudulently induce GLC to enter into the HEA (see Carbon Capital Mgt., LLC v American Express Co., 88 AD3d 933 [2011]; Monaghan v Ford Motor Co., 71 AD3d 848 [2010]).
Defendants’ motion to stay this action pending the outcome of the arbitration should be granted. CPLR 2201 provides that “[e]xcept where otherwise prescribed by law, the court in which an action is pending may grant a stay of proceedings in a proper case, upon such terms as may be just.” This Court has stayed litigation that included nonsignatories to the subject arbitration agreement where the non-signing party was closely related to the signatories and was alleged to have engaged in substantially the same improper conduct (see Pacer/Cats/CCS v MovieFone, Inc., 226 AD2d 127 [1996]). Here, although there is not a complete identity of parties, the arbitration statement of claims and the complaint contain overlapping factual allegations, and both seek the same damages, including all costs and expenses related to the replacement, repair, inspection, and maintenance of the boiler stacks, and lost steam revenue. Thus, the determination of the pending arbitration proceeding may well dispose of or limit the issues to be determined in this action (see Belopolsky v Renew Data Corp., 41 AD3d 322 [2007]).
We have considered the parties’ remaining arguments for affirmative relief and find them unavailing. Concur — Andrias, J.P., Friedman, DeGrasse, Freedman and Manzanet-Daniels, JJ.