*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NANCY KOVACIC,

*Plaintiff*,

KATHERINE KOVACIC and DANIEL KOVACIC,
*Plaintiffs-Appellees*,

      No. 11-4002

v.

CUYAHOGA COUNTY DEPARTMENT OF
CHILDREN AND FAMILY SERVICES,
*Defendant*,

PATRICIA CAMPBELL-PONSTINGLE, PAM
CAMERON, and VIKKI L. CSORNOK,
*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:05-CV-2746—Sara E. Lioi, District Judge.

Argued: March 6, 2013

Decided and Filed: July 31, 2013

Before: BOGGS, MOORE, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Steven W. Ritz, CUYAHOGA COUNTY PROSECUTOR'S OFFICE, Cleveland, Ohio, for Appellants. Jay F. Crook, SHRYOCK, CROOK & ASSOCIATES L.L.P., Wickliffe, Ohio, for Appellees. **ON BRIEF:** Steven W. Ritz, CUYAHOGA COUNTY PROSECUTOR'S OFFICE, Cleveland, Ohio, for Appellants. Jay F. Crook, SHRYOCK, CROOK & ASSOCIATES L.L.P., Wickliffe, Ohio, for Appellees.

      MOORE, J., delivered the opinion of the court in which BOGGS, J., joined. SUTTON, J. (pp. 18–35), delivered a separate dissent.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  In 2002, Plaintiffs-Appellees Daniel Kovacic and Katherine Kovacic (collectively, "the children") were temporarily removed from the custody of their mother Plaintiff Nancy Kovacic ("Nancy") by Defendant Cuyahoga County Department of Children and Family Services ("CCDCFS"). Defendant-Appellant Patricia Campbell-Ponstingle, a social worker involved with the case, determined that exigent circumstances existed and, with the assistance of North Olmsted police officers, removed the children from Nancy's home.  Campbell-Ponstingle and Defendants-Appellants Vikki Csornok and Pam Cameron (collectively, "the social workers"), moved for summary judgment on the Fourth and Fourteenth Amendment claims relating to the seizure of the children, arguing that they were entitled to absolute and qualified immunity.  The district court denied the absolute-immunity motion in part and the qualified-immunity motion in its entirety.  The social workers filed an interlocutory appeal challenging each of these rulings.  For the reasons stated below, we **AFFIRM** the district court's denial in part of the social workers' absolute-immunity motion and its denial of the social workers' qualified-immunity motion and **REMAND** for further proceedings.

## I. BACKGROUND

Filed in 2005, this case has developed a long and complicated history.  The following background is relevant to this appeal.  At the time of the children's removal, a Cuyahoga County Juvenile Court standing order was in effect providing that "all direct service social workers employed by the Cuyahoga County Department of Children and Family Services, who are responsible for the investigation of child abuse, neglect, or dependency matters, are hereby reappointed as Duly Authorized Officers of the Court in accordance with Section 2151.31 of the Ohio Revised Code and Ohio Juvenile Rule 6."  R. 125-2 (Juvenile Court Order at 1) (Page ID #386).  Pursuant to this order, "said social workers shall have the authority to remove and provide temporary emergency care

and shelter for children who are at imminent risk of serious physical or emotional harm." *Id.* Social workers were also permitted to "request the assistance of appropriate law enforcement officers, including but not limited to municipal police officers and county deputy sheriffs." *Id.*

At a March 26, 2002 meeting, the social workers determined that exigent circumstances required immediate removal of the children from Nancy's home. That same day, Campbell-Ponstingle effectuated a Temporary Emergency Care Order ("TEC Order"), a document completed by social workers when removing children without a warrant. R. 121-9 (TEC Order at 1) (Page ID #330). The TEC Order required consultation with an assistant prosecuting attorney and a supervisor. *Id.* Upon completion of the TEC Order, Campbell-Ponstingle, accompanied by police officers, went to Nancy's home and took the children into temporary custody of the county. The following day, Campbell-Ponstingle filed a complaint for abuse, neglect, and temporary custody with the Cuyahoga County Juvenile Court, which included a notarized document detailing her recommendation of removal and the supporting reasons. R. 121-11 (Compl. at 1) (Page ID #332). After a hearing on March 29, 2002, the family court magistrate found that probable cause existed to support the removal and ordered the children "committed to the emergency care and custody of the Agency pending further hearing." R. 121-14 (Magistrate Order at 1–2) (Page ID #340–41).

On November 28, 2005, Nancy and the children filed a civil action in the U.S. District Court for the Northern District of Ohio against the CCDCFS, the social workers, and ten others. R. 1 (Compl. at 1–3) (Page ID #1–3). In 2010, the parties filed cross-motions for summary judgment on the Fourth and Fourteenth Amendment claims relating to the seizure of the children. R. 120 (Pls.' Mot. for Summ. J.) (Page ID #182); R. 121 (Defs.' Mot. for Summ. J.) (Page ID #206). The district court granted in part and denied in part the social workers' motion for summary judgment on the basis of absolute immunity, denied the social workers' motion for summary judgment on the basis of qualified immunity, and granted in part the children's motion for summary judgment on their remaining Fourth and Fourteenth Amendment claims. R. 132 (Order at 55–56)

(Page ID #555–56). The social workers filed an interlocutory appeal challenging the district court's denial of absolute and qualified immunity. R. 135 (Notice of Interlocutory Appeal at 1) (Page ID #560) ("The *Memorandum and Order* and *Judgment Entry* issued by the District Court denied the above listed defendants' claims of both absolute and qualified immunity."). The merits of the children's motion for summary judgment is not before us.

## II.  JURISDICTION

"Jurisdiction in this matter arises under 28 U.S.C. § 1291, granting jurisdiction to hear appeals from final judgments of district courts." *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004). "Generally, a denial of summary judgment is not a final judgment for purposes of appeal." *Id.* Judgments "where assessment of damages or awarding of other relief remains to be resolved have never been considered to be 'final' within the meaning of 28 U.S.C. § 1291." *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976). Because assessment of damages has yet to be resolved in this case, the district court's summary-judgment order does not constitute a final judgment. R. 132 (Order at 55–56) (Page ID #555–56).

The Supreme Court, however, has carved out an exception to this general rule for denials of immunity to public officials. *Mitchell v. Forsyth*, 472 U.S. 511, 524–27 (1985). Under this exception, "district court denials of qualified immunity may be appealed as collateral orders where (1) the defendant is a public official asserting the defense of qualified immunity, and (2) the issue appealed concerns not which facts the parties might be able to prove, but whether certain alleged facts reflect a violation of clearly established law." *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002). In other words, "a denial of summary judgment based on a legal determination that qualified immunity is inappropriate is immediately appealable as a collateral order." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 578 (6th Cir. 2003).

Similarly, "[t]he denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." *Leech v.*

*DeWeese*, 689 F.3d 538, 541 (6th Cir. 2012) (internal quotation marks omitted).  We therefore have jurisdiction to review the district court's denial in part of absolute immunity and its denial of qualified immunity.

## III.  STANDARD OF REVIEW

"Whether a defendant is entitled to absolute or qualified immunity from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo*."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

## IV.  ABSOLUTE IMMUNITY

The district court granted absolute immunity to the social workers for effectuating the TEC Order, initiating formal removal proceedings, and testifying in court.  R. 132 (Order at 44) (Page ID #544).  The district court did not extend absolute immunity, however, to the act of removing the children from Nancy's home, determining that this was analogous to a police function rather than a prosecutorial or judicial function.  *Id.* at 42–44 (Page ID #542–44).  The social workers challenge this distinction, arguing that they acted in conformity with precisely that which was contemplated by the TEC Order—taking custody of the children.  Appellants Br. at 29.  The children rejoin that "[w]hile the workers were in possession of the order, their decision on when, and how to execute it were not 'intimately related' to the judicial process, but were in fact the actions of a[n] individual exercising police type powers."  Appellees Br. at 18.  The children further argue that the social workers' "decision to . . . take the children in the manner that they did cannot [b]e said to be the function of an advocate."  *Id.*

We have recognized that social workers are entitled to absolute immunity when they engage in conduct "intimately associated with the judicial phase of the criminal process."  *Pittman v. Cuyahoga Cnty. Dep't of Children & Fam. Servs.*, 640 F.3d 716, 724 (6th Cir. 2011) (internal quotation marks omitted).  In other words, "social workers are absolutely immune only when they are acting in their capacity as *legal advocates*—initiating court actions or testifying under oath—not when they are performing administrative, investigative, or other functions."  *Id.* (internal quotation

marks omitted). When applied, "[t]he defense of absolute immunity provides a shield from liability for acts performed erroneously, even if alleged to have been done maliciously or corruptly." *Dean v. Byerley*, 354 F.3d 540, 554 (6th Cir. 2004).

Social workers often engage in prosecutorial functions when carrying out their duties. As we explained in *Pittman*, absolute immunity based on a prosecutorial function covers interactions with a court, such as "testimony or recommendations given in court concerning the child's best interests as she saw the matter." 640 F.3d at 725 (internal quotation marks omitted). However, this immunity does not extend to "participating in agency decisions." *Id.* at 726 (internal quotation marks omitted); *see also Holloway v. Brush*, 220 F.3d 767, 776 (6th Cir. 2000) (en banc) ("It is her *out-of-court* actions, misinforming Holloway and failing to inform the court of the latter's appearance, that are the basis of this suit."). "Social workers who initiate judicial proceedings against those suspected of child abuse or neglect perform a prosecutorial duty, and so are entitled to absolute immunity." *Rippy v. Hattaway*, 270 F.3d 416, 421 (6th Cir. 2001) (internal quotation marks omitted). Filing the complaint for abuse, neglect, and temporary custody on March 27, 2002, which initiated formal court proceedings, is clearly prosecutorial in nature under this standard and thus protected by absolute immunity. Similarly, preparing the TEC Order, which precedes the filing of the complaint, was prosecutorial in nature under this standard and thus also protected by absolute immunity.

Concerning the removal of the children from the home, the district court did not err in denying the social workers' motion for absolute immunity. When the social workers removed the children from the home, they were acting in a police capacity rather than as legal advocates. *See Millspaugh v. Cnty. Dep't of Public Welfare*, 937 F.2d 1172, 1176 (7th Cir. 1991) ("Sallying forth to collect the children is no different from seizing evidence on the authority of a warrant, which again is covered by qualified immunity only."); *see also Holloway*, 220 F.3d at 777 ("The question is whether the prosecutors have carried their burden of establishing that they were functioning as advocates (as opposed, for example, to auxiliary police) when they performed the actions

complained of.") (internal quotation marks and alteration omitted).  We therefore **AFFIRM** the district court's determination denying in part absolute immunity.

## V.  QUALIFIED IMMUNITY

"A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that:  (1) the defendant violated a constitutional right; and (2) the right was clearly established."  *Morrison v. Bd. of Trustees*, 583 F.3d 394, 400 (6th Cir. 2009).  The social workers argue that the district court erred in denying their motion for summary judgment based on qualified immunity, contending that exigent circumstances existed and that the relevant Fourth and Fourteenth Amendment rights were not clearly established as of March 26, 2002.

### A.  Violation of a Constitutional Right

"[A] social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement."  *Andrews v. Hickman Cnty.*, 700 F.3d 845, 859 (6th Cir. 2012).  "This would simply mean that social workers would have to obtain consent, have sufficient grounds to believe that exigent circumstances exist, or qualify under another recognized exception to the warrant requirement before engaging in warrantless entries and searches of homes."  *Id.* at 859–60.  Here, the social workers did not have a warrant to remove the children from their home.  They argue that they complied with the Fourth Amendment nonetheless due to exigent circumstances.

"Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant," including "the need to assist persons who are seriously injured or threatened with such injury."  *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010) (internal quotation marks omitted).  "Preventing imminent or ongoing physical abuse within a home qualifies as an exigent circumstance."  *Schreiber v. Moe*, 596 F.3d 323, 330 (6th Cir. 2010).  "[T]he cases finding exigent circumstances uniformly cite the need for prompt action by government personnel, and conclude that delay to secure a warrant would be unacceptable under the

circumstances." *United States v. Rohrig*, 98 F.3d 1506, 1517 (6th Cir. 1996). In addition to providing an exception to the warrant requirement under the Fourth Amendment, exigent circumstances may alter the notice and hearing requirements typically required under the Fourteenth Amendment in child-removal cases. *Doe v. Staples*, 706 F.2d 985, 990 (6th Cir. 1983) (explaining that due process requires, among other things, that "[t]he parents be given notice prior to the removal of the child (at the time of the removal when exigent circumstances exist or promptly thereafter) stating the reasons for the removal").

The social workers direct us to the following evidence that they argue supports a finding of exigent circumstances.[1] First, the social workers cite portions of Campbell-Ponstingle's deposition testimony, where she describes that the children's aunt told her that "Nancy pushed Katie into the door" and that Nancy "hit Danny." R. 121-8 (Campbell-Ponstingle Tr. at 53:22–25, 60:1–3) (Page ID #311–12). Campbell-Ponstingle also recalled a prior report that "Katie received a bloody nose from her mother . . . and [that Katie] was pulled by the hair and pushed into a door frame." *Id.* at 38:1–39:3 (Page ID #307–08). Additionally, the social workers rely on Csornok's description of the March 26, 2002 meeting at which the decision to seek a TEC Order was made. Csornok testified that several police officers attended the meeting and that it was their belief that Nancy's failure to attend the meeting was a sign that her behavior was escalating and that she intended to kill her children.[2] R. 121-6 (Csornok Tr. at 61:13–63:20) (Page ID #278–80). However, according to Cameron, no one inquired specifically as to how the police officers knew the children or when the most recent interaction between the officers and the children occurred. R. 121-7 (Cameron Tr. at

---

[1]The dissent relies on background information, much of which occurred years prior to the incident at hand, without establishing that the social workers were aware of this information at the time that they made their decision to remove the children or that there was any credible threat of these incidents recurring in 2002. In evaluating exigency, however, we must look to the information that was known to the social workers on March 26, 2002, so that we can evaluate whether "an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002).

[2]The dissent's assertion that "the meeting was the first time many of the relevant actors were in the same room—and as a result the shared information could reasonably have had a crystallizing effect on the social workers" was not articulated by the social workers in their briefs. Dissent at 28.

18:13–25) (Page ID #283). The social workers further point to Cameron's testimony, in which she describes general allegations such as "[v]erbal aggression was escalating to a lot of yelling and screaming, hair pulling." *Id.* at 33:6-11 (Page ID #288). When asked if there was a specific incident that led to the removal, Cameron stated that "I really felt upset when I learned that Katie was slapped in the face by [her] mother, because she expressed some desire to be around her father or his people, or whatever." *Id.* at 34:4–8 (Page ID #289).

When taken in the light most favorable to the children, as we must on the social workers' summary-judgment motion, these circumstances cited by the social workers—reliance on weeks-old incidents and Nancy having missed the March 26 meeting—simply do not constitute exigent circumstances as a matter of law. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) ("*First*, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred.") (internal quotation marks omitted). Nor does the subsequent determination of the family court magistrate that there "is" probable cause make a difference. The relevant question is whether there was *exigency*, not probable cause: in the absence of exigency, a warrant is required, even "when probable cause is clearly present." *Payton v. New York*, 445 U.S. 573, 589 (1980) (internal quotation marks omitted).

Moreover, and contrary to the dissent's intimations otherwise, the merits of the Fourth and Fourteenth Amendment claims, and the district court's rulings on the children's summary-judgment motion, are not before us on this interlocutory appeal, and the parties did not request that we consider the grant of partial summary judgment to the plaintiffs under the doctrine of pendent appellate jurisdiction. *See McCloud v. Testa*, 97 F.3d 1536, 1545 (6th Cir. 1996) ("Testa does not argue that this discretionary doctrine [of pendent appellate jurisdiction] should be invoked in this case and therefore we need not address its applicability here."). In their Notice of Interlocutory Appeal, the social workers specifically reference the denials of qualified and absolute immunity as the basis for their appeal: "The *Memorandum and Order* and *Judgment Entry* issued by

the District Court denied the above listed defendants' claims of both absolute and qualified immunity."  R. 135 (Notice of Interlocutory Appeal at 1) (Page ID #560). Additionally, the parties' briefing makes clear that they seek review only on the district court's immunity determinations.  For example, the social workers' opening brief includes the following statement of issues:

> Whether the district court erred in denying the claim of absolute immunity of Social Workers Patricia Campbell-Ponstingle, Pamela Cameron and Vikki L. Csornok?

> Whether the district court erred in denying the claim of qualified immunity of Social Workers Patricia Campbell-Ponstingle, Pamela Cameron and Vikki L. Csornok?

Appellants Br. at 3; *see also id.* at 1 ("Appellants . . . are challenging the denial of their claims of absolute and\or qualified immunity."); *id.* at 5 ("The Social Workers filed their notice of appeal on September 15, 2011 from the denial of their claims of qualified and absolute immunity."); *id.* at 13 ("For all the reasons set forth in this Brief, the Social Workers are entitled to absolute and\or qualified immunity."); *id.* at 30 ("Appellants respectfully request that their appeal be heard and that this court overrules the District Court's denial of their claims of absolute or qualified immunity.").  Likewise, the children frame the issue on appeal as follows:  "The issue before the court is one of the applicability of the affirmative defenses of qualified immunity and absolute immunity for social workers who conspired to take custody through a non-consensual seizure of minor children through the functioning of a TEC order."  Appellees Br. at 1.  In their reply brief, the social workers remain focused on the immunity defenses, explaining that they "offer this Court this Reply Brief in support of their request for qualified and\or absolute immunity."  Reply Br. at 1; *see also id.* at 7 ("Appellants respectfully request that their appeal be sustained and that they be entitled to judgment on the basis of immunity.").

In sum, there is no indication that the parties seek review of the district court's grant of partial summary judgment to the children, and the parties have not requested that we exercise our pendent appellate discretion to review this ruling.  *See* CHARLES

ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3937 (2d ed. 1987) ("[D]iscretion to exercise pendent appeal jurisdiction should be used sparingly."). We therefore decline to exercise pendent appellate jurisdiction[3] and reserve judgment on those issues.

## B. Clearly Established Rights

We now turn to whether the law was clearly established on March 26, 2002, that a social worker could not seize children from their home without a warrant, exigent circumstances, or another recognized exception. "A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right."[4] *Morrison*, 583 F.3d at 400 (internal quotation marks and alterations omitted). "The objective legal reasonableness standard requires us to analyze whether a case worker in [the social workers'] position objectively would have understood that she was under an affirmative duty to have refrained from such conduct." *Jordan v. Murphy*, 145 F. App'x 513, 517 (6th Cir. 2005) (internal quotation

---

[3]The dissent cannot escape the binding precedent of our court by choosing to label it as dicta. We have held in numerous published opinions, in the context of qualified immunity and others, that pendent appellate jurisdiction allows "a court of appeals . . . , in its discretion, [to] exercise jurisdiction over issues that are not independently appealable when those issues are inextricably intertwined with matters over which the appellate court properly and independently has jurisdiction." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 549 (6th Cir. 2002) (internal quotation marks omitted); *see also, e.g.*, *Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013); *Lowe v. Hamilton Cnty. Dep't of Job & Family Servs.*, 610 F.3d 321, 323–24 (6th Cir. 2010); *Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 348 (6th Cir. 2010); *O'Bryan v. Holy See*, 556 F.3d 361, 377 n.7 (6th Cir. 2009); *Meals v. City of Memphis*, 493 F.3d 720, 731 (6th Cir. 2007). And we are not alone in reaching this conclusion. In fact, every other circuit has similarly described pendent appellate jurisdiction as a discretionary doctrine. *See, e.g.*, *Orenshteyn v. Citrix Sys., Inc.*, 691 F.3d 1356, 1358–63 (Fed. Cir. 2012); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 492 (7th Cir. 2012); *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1147–48 (10th Cir. 2011); *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 88 (3d Cir. 2010); *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 28 n.4 (2d Cir. 2010); *Mueller v. Auker*, 576 F.3d 979, 990 (9th Cir. 2009); *Byrum v. Landreth*, 566 F.3d 442, 449–50 (5th Cir. 2009); *Dible v. Scholl*, 506 F.3d 1106, 1109 (8th Cir. 2007); *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1288 (D.C. Cir. 2007); *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1335 (11th Cir. 1999); *Camilo-Robles v. Hoyos*, 151 F.3d 1, 10 n.9 (1st Cir. 1998). Moreover, commentators on the subject have done the same. *See, e.g.*, Joan Steinman, *The Scope of Appellate Jurisdiction: Pendent Appellate Jurisdiction Before and After* Swint, 49 HASTINGS L.J. 1337, 1482 (March 1998) (explaining that discretion should inform a court's decision whether to exercise pendent appellate jurisdiction).

[4]Contrary to the dissent's suggestion otherwise, whether a plaintiff decides to protest a purported constitutional violation during the incident has no bearing on the state of the law at the time of the incident. It would be radical indeed if a plaintiff were required to object contemporaneously to the violation of his constitutional rights in order to make a showing that these rights were clearly established at the time of the incident.

marks omitted). "When determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews*, 700 F.3d at 853.

With respect to the Fourth Amendment right, basic Fourth Amendment principles establish that government officials must obtain a warrant to conduct a search or seizure on private property, absent exigent circumstances or another recognized exception. *Payton*, 445 U.S. at 587–89. As a general matter, these requirements apply to all searches and seizures investigating criminal activity conducted under official sanction, not just police officers. *Camara v. Municipal Court*, 387 U.S. 523, 530–31 (1967). The text of the Fourth Amendment makes no distinctions, instead invoking a generalized "right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. For this reason, "the presumption appears to be that any state officer should operate with the default understanding that the Fourth Amendment applies to her actions, unless a specific exception to the requirements of the Fourth Amendment has been found to apply." *Andrews*, 700 F.3d at 859.

The dissent attempts to rebut this presumption by listing a series of cases that consider various issues relating to the Fourth Amendment, including our recent decision in *Andrews*, where we held that the law on warrantless entries by social workers into the home for the purpose of investigation was unsettled in our circuit at the time of the social workers' conduct in that case. *Id.* at 862–63. *Andrews*, however, relied primarily on an ambiguous holding in *Jordan*, an unpublished 2005 case that addressed the same issue present in *Andrews*. More important for our purposes, though, is that while *Andrews* addressed the warrantless *entry* of social workers into homes, our case at bar involves the warrantless *removal* of children from their homes, an area of Fourth Amendment law that is not tainted by the same "lack of clarity" present in *Andrews*. *Id.* at 863. In fact, "it is core Fourth Amendment doctrine that a seizure without consent or a warrant is a 'reasonable' seizure if it is justified by 'exigent circumstances.'" *Tenenbaum v. Williams*, 193 F.3d 581, 605 (2d Cir. 1999). While there certainly remain unresolved

issues relating to the Fourth Amendment, as noted by the dissent,[5] the issue at hand—whether a government official can seize children from their homes without a warrant or exigent circumstances—is simply not one of them. *See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012) (explaining that a court must "carefully define the right").

In sum, there is an absence of pre-2002 case law specifically mentioning social workers, which under our binding precedent is insufficient to upset the presumption that all government searches and seizures are subject to the strictures of the Fourth Amendment.[6] We thus agree with the district court that at the time of the social workers' actions, it was clearly established that Fourth Amendment warrant requirements, including the exigent-circumstances exception, apply to the removal of children from their homes by social workers.

Concerning the Fourteenth Amendment due-process right, we established in *Doe* that in the context of child removal, due process requires, among other things, that "parents be given notice prior to the removal of the child . . . stating the reasons for the

---

[5] The majority of cases cited by the dissent in support of its assertion that Fourth Amendment law is unsettled with respect to removing children from a home without a warrant address legal theories that are not at issue in this case. For example, the statements quoted by the dissent from *Hatch v. Department for Children, Youth & Their Families*, 274 F.3d 12, 20–22 (1st Cir. 2001), *Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir. 1992), and *Croft v. Westmoreland County Children & Youth Services*, 103 F.3d 1123, 1125–26 (3d Cir. 1997), concern Fourteenth Amendment due-process rights rather than the Fourth Amendment exigency requirement. Similarly, the statement that the law was unsettled in *Gates v. Texas Department of Protective & Regulatory Services*, 537 F.3d 404, 426 (5th Cir. 2008), addressed entry into the home rather than removal of the children, as asserted by the dissent.

Additionally, the dissent omits critical aspects of other out-of-circuit cases. In *Mueller v. Auker*, 700 F.3d 1180 (9th Cir. 2012), for example, the Ninth Circuit considered "special needs" in the context of necessary medical procedures in an emergency room rather than the removal of children from the home under the guise of exigency, as described by the dissent. *Id.* at 1189. The dissent also omits a crucial statement in *Roe v. Texas Department of Protective & Regulatory Services*, 299 F.3d 395 (5th Cir. 2002), where the Fifth Circuit remarked, "[w]e have held that the Fourth Amendment regulates social workers' civil investigations." *Id.* at 401. Finally, the dissent omits the following qualifying sentence immediately following the quoted passage in *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000): "While we agree that that is generally the case, as noted above, some governmental actions are so clearly beyond the pale that a reasonable person should have known of their unconstitutionality even without a closely analogous case." *Id.* at 1023.

[6] We do not discount the dissent's concern with the delicate balance between a child's safety and the potential harm of a premature or unwarranted removal. Rather, we agree with the Second Circuit that "if CWA caseworkers have special needs, we do not think that freedom from ever having to obtain a predeprivation court order is among them. Caseworkers can effectively protect children without being excused from *whenever practicable*, obtaining advance judicial approval of searches and seizures." *Tenenbaum*, 193 F.3d at 604 (internal quotation marks and alterations omitted).

removal . . . [and that] [t]he parents be given a full opportunity at the hearing to present witnesses and evidence on their behalf." 706 F.2d at 990. The district court, relying on *Doe*, determined that "[n]o reasonable social worker could conclude that the law permitted her to remove a child without notice or a pre-deprivation hearing where there was no emergency." R. 132 (Order at 49) (Page ID #549). On appeal, the social workers argue that *Doe* establishes the rights of parents who are facing a separation from their children, but does not establish the rights of a child. Appellants Br. at 26–27. This argument fails, though, as the Supreme Court has described the due-process right as one that applies to both children and parents: "At the factfinding, the State cannot presume that a child and his parents are adversaries. . . . [U]ntil the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky v. Kramer*, 455 U.S. 745, 760 (1982); *see also Teets v. Cuyahoga Cnty.*, 460 F. App'x 498, 501 (6th Cir. 2012) ("'The Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship.'") (alteration omitted) (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)). The district court did not err in concluding that the due-process right at issue was clearly established in 2002.

## C. Constitutionality of Ohio Revised Code § 2151.31(A)(6)

Contrary to the dissent's suggestion, Ohio Revised Code § 2151.31(A)(6) is simply not relevant to this case. As an initial matter, a review of the evidence shows that the social workers acted pursuant to § 2151.31(A)(3) rather than § 2151.31(A)(6).[7] The

---

[7]Section 2151.31(A) provides as follows:

(A)  A child may be taken into custody in any of the following ways:

. . .

(3)  By a law enforcement officer or duly authorized officer of the court when any of the following conditions are present:

(a) There are reasonable grounds to believe that the child is suffering from illness or injury and is not receiving proper care, as described in section 2151.03 of the Revised Code, and the child's removal is necessary to prevent immediate or threatened physical or emotional harm;

(b) There are reasonable grounds to believe that the child is in immediate danger from the child's surroundings and that the child's removal is necessary to prevent immediate

TEC Order plainly states that Campbell-Ponstingle, Cameron, and the assistant prosecuting attorney authorized the removal of the children under § 2151.31(A)(3). R. 121-9 (TEC Order at 1) (Page ID #330) ("Authorizing the Taking of Child(ren) into Custody Ohio Revised Code Section 5153.16(A)(7) and 2151.31(A)(3)."). Additionally, when Campbell-Ponstingle filed the complaint for abuse, neglect, and temporary custody, she stated as follows: "The children were removed on March 26, 2002 pursuant to Ohio Revised Code Sections 5153.16(A)(7) and 2151.31(A)(3)." R. 121-11 (Compl. at 1) (Page ID #332) (emphasis omitted). Finally, the magistrate found probable cause to remove the children under § 2151.31(A)(3): "Based upon the above testimony and/or stipulations, the Magistrate finds that there . . . is . . . probable cause for the removal of the child(ren) pursuant to R.C. . . . 2151.31(A)(3)(b) [and] 2151.31(A)(3)(c)." R. 121-10 (Probable Cause Worksheet) (Page ID #331) (emphasis omitted); R. 121-14 (Magistrate Order at 1) (Page ID #340) (same). All of the evidence before us illustrates that the

---

or threatened physical or emotional harm;

(c) There are reasonable grounds to believe that a parent, guardian, custodian, or other household member of the child's household has abused or neglected another child in the household and to believe that the child is in danger of immediate or threatened physical or emotional harm from that person.

. . .

(6) By a law enforcement officer or duly authorized officer of the court when any of the following apply:

(a) There are reasonable grounds to believe that the conduct, conditions, or surroundings of the child are endangering the health, welfare, or safety of the child.

(b) A complaint has been filed with respect to the child under section 2151.27 or 2152.021 of the Revised Code or the child has been indicted under division (A) of section 2152.13 of the Revised Code or charged by information as described in that section and there are reasonable grounds to believe that the child may abscond or be removed from the jurisdiction of the court.

(c) The child is required to appear in court and there are reasonable grounds to believe that the child will not be brought before the court when required.

(d) There are reasonable grounds to believe that the child committed a delinquent act and that taking the child into custody is necessary to protect the public interest and safety.

OHIO REV. CODE ANN. § 2151.31(A).

social workers believed there were exigent circumstances pursuant to § 2151.31(A)(3).[8] There is no evidence that the social workers in this case entertained § 2151.31(A)(6) as a possible basis for removal at any point in the discussions or proceedings.

More significantly, neither the TEC Order; the complaint for abuse, neglect, and temporary custody; nor the magistrate order—all of which are standardized forms—includes § 2151.31(A)(6) as a potential basis for an emergency removal.[9] *See, e.g.*, *Denton v. Rievley*, 353 F. App'x 1, 6 (6th Cir. 2009) ("Even if compliance with a state statute generally renders an officer's conduct more reasonable, this particular statute . . . is not necessarily applicable to the case at hand.").[10] In other words, there is no evidence in the record before us that social workers or magistrates would ever rely on § 2151.31(A)(6) to support a warrantless removal of children from their home, let alone that they did so here.[11] Eager to strike down § 2151.31(A)(6), the dissent glosses

---

[8]The dissent's suggestion that the social workers were blindsided by the exigency requirement ignores the fact that they cited § 2151.31(A)(3) multiple times during the proceedings and discussed the need for exigent circumstances in their depositions. While we might imagine a situation in which social workers would not have been aware of such a requirement, it is inapposite to make such an argument here.

[9]Additionally, the 1988 standing order expressly refers to § 2151.31(A)(3), (C), and (G): "all direct service social workers . . . are duly authorized by this Court to take into custody and provide temporary emergency care for a child deemed to be in need of such care under the circumstances provided in Ohio Revised Code Sections 2151.31(A)(3), (C) and (G) and Rule 6 of the Ohio Rules of Juvenile Procedure." R. 121-4 (1988 Order at 2) (Page ID #258). The initial standing order thus clearly envisioned authorizing temporary emergency removals under those provisions enumerated.

[10]The dissent relies on *Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003), for the proposition that the mere existence of § 2151.31(A)(6) supports the conclusion that the social workers acted reasonably. However, *Roska*'s reasoning contradicts such a determination. In *Roska*, "the district court concluded that defendants were entitled to qualified immunity, based on defendants' reliance on Utah Code Ann. § 78-3a-301." *Id.* at 1252. The Tenth Circuit disagreed, explaining that "[§] 78-3a-301 does not authorize removal absent pre-deprivation procedures." *Id.* In other words, "reliance on section 78-3a-301 alone could not render the defendants' conduct objectively reasonable, insofar as the statute did not authorize the unconstitutional conduct in question." *Id.* The Tenth Circuit then declined to address a second statutory provision because, among other reasons, "the appropriate inquiry is not whether a reasonable state officer *could* have concluded that the statute authorized the unconstitutional conduct in question." *Id.* at 1253 (emphasis added). "Rather, a court must consider whether reliance on the statute rendered the officer's conduct 'objectively reasonable.'" *Id.* The discussion in *Roska* thus underscores the importance of considering only those statutes relevant to the violation at issue and to the actions of the defendants.

[11]Moreover, we decline to accept the dissent's assertion that § 2151.31(A)(6) authorized the social workers' conduct in this case. Dissent at 20. Without citations to the record or to Ohio law, we remain unpersuaded that § 2151.31(A)(6) is more applicable than § 2151.31(A)(3), the provision cited by the social workers at the time of the removal. Notably, the portion of the dissent's opinion assessing whether the social workers violated the children's Fourth Amendment rights considers only exigency; there is no mention of the reasonable-grounds exception that the dissent suggests purportedly authorized the removal of the children in this case.

over this point, providing no support for its contention that § 2151.31(A)(6) is an emergency-removal provision or that any social worker has ever used § 2151.31(A)(6) to remove a child from her home without a warrant. To the contrary, Ohio courts employ § 2151.31(A)(3) in emergency-removal cases. *See, e.g.*, *In re C.F.*, 862 N.E.2d 816, 818 (Ohio 2007) (citing § 2151.31(A)(3)(b)); *In re Ridenour*, Nos. 2003-L-146, 2003-L-147, 2003-L-148, 2004 WL 834579, at *1 (Ohio Ct. App. Apr. 16, 2004) (citing § 2151.31(A)(3)(b)); *In re Anthony G.*, Nos. WD-01-048, WD-01-049, WD-01-050, WD-01-051, 2002 WL 360706, at *1 (Ohio Ct. App. Mar. 6, 2002) (citing § 2151.31(A)(3)); *Wade v. Director, Cuyahoga Cnty. Dep't of Children & Fam. Servs.*, No. 76752, 1999 WL 961516, at *1 (Ohio Ct. App. Oct. 15, 1999) (citing § 2151.31(A)(3)(b) and (A)(3)(c)). Our review of Ohio case law revealed no such pattern with respect to § 2151.31(A)(6). Indeed, we could not find even one instance of its use.

The social workers acted pursuant to § 2151.31(A)(3), an Ohio statute that required exigency, and they believed that such exigency was apparent. That they may have unreasonably evaluated whether exigent circumstances existed does not justify an eleventh-hour attempt to avoid liability by introducing a distinct statutory provision of no relevance to the inquiry at hand. The constitutionality of § 2151.31(A)(6) is simply not before us, and we decline to strike down a state statute based wholly on its proximity to the provision in the Ohio Revised Code at issue. We therefore **AFFIRM** the district court's denial of qualified immunity to the social workers.

## VI. CONCLUSION

For the reasons stated, we **AFFIRM** the district court's denial in part of the social workers' absolute-immunity motion and its denial of the social workers' qualified-immunity motion. We **REMAND** for further proceedings.

---

**DISSENT**

---

SUTTON, J., dissenting. Say you are a social worker. You are monitoring an unhappy family unhappy in its own way. After the parents divorce, they begin behaving badly when it comes to custody over their children. The mother, perhaps unfairly, perhaps not, is the immediate focus of concern. Over several years, she has had a series of encounters with social workers and police officers, each raising concerns about her stability and her capacity to care safely for her children. On March 26, 2002, you and five other social workers and officers along with several members of the Kovacic family meet to discuss the situation, and, with your operational silos removed, discuss the risk that the mother might imminently harm the two children, ages 11 and 8. The mother is invited but at the last minute declines to attend. You and the government officials together perceive risks you had not perceived individually. You act. Consistent with two state statutes and a standing order of the juvenile court concerning child endangerment, you remove the two children from the custody of their mother. Within three days, and again consistent with state law, a state court judge holds a hearing. She finds that the requisite endangerment and emergency existed, requiring the children to remain in state custody. State law provides a right of appeal, but the mother does not exercise it and never challenges the ruling. The children remain in the custody of the State (and a family member) for ten months.

Eleven years later, a federal court of appeals considers whether the two children may recover money damages from you and the other social workers under § 1983 for seizing them in violation of the Fourth and Fourteenth Amendments. At that point, the court is told about the seen risks of a seizure (removal of children from their mother) and cannot be told about the unseen risks of a non-seizure (irreversible harm to the children) because you eliminated that danger. Let the reader be the judge. I for one would grant qualified immunity to the social workers.

Because no one can perceive all risks of government action and inaction, the seen together with the unseen, American law does not lightly second guess the actions of public officials and thus does not lightly allow citizens to sue them after the fact for damages. Judges, the Supreme Court has held, receive *absolute* immunity from § 1983 actions. (Thank you.) *Pierson v. Ray*, 386 U.S. 547, 554–55 (1967). Other government officers, generally speaking, receive *qualified* immunity from § 1983 damages actions. They will not be held liable for constitutional torts so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). If an official "reasonably believes that his or her conduct complies with the law," the accent being on "reasonably," qualified immunity applies. *Pearson v. Callahan*, 555 U.S. 223, 245 (2009). The defense prompts a present-tense and a past-tense inquiry: Does the seizure violate the requirements of the Fourth and Fourteenth Amendments? If so, were those requirements clearly established at the time of the seizure—here in 2002? I would skip the first question, *id.* at 236, and answer no to the second.

*1. Qualified immunity from the Fourth Amendment claim.* Even if a triable issue of fact exists over whether the social workers violated the Constitution by taking custody of the children on March 26, hardly self-evident on this record, they could be held liable only if the right were clearly established at the time of the violation. Three considerations convince me that the social workers could reasonably think in 2002, when this long-ago seizure occurred, that their actions were legitimate.

*First*, before considering the state of Fourth Amendment law in 2002, it is worth remembering that the social workers had at least two sources of state authority for doing what they did—a situation hardly suggestive of actions by the "plainly incompetent." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The relevant Ohio statute, entitled "Taking child into custody," offers at least two standards relevant to this case. One subsection requires an exigency before officers or social workers may remove a child in the absence of a court order. It allows removal when "necessary to prevent immediate or threatened physical or emotional harm." Ohio Rev. Code § 2151.31(A)(3)(a)–(c). The social

workers complied with all of the procedural requirements of this law.  They followed a judicial standing order entered under the statute, obtaining permission from the prosecutor to seize the children.  They filed the requisite complaint after the seizure.  And within three days of the seizure, a state court judge found that the children belonged in state custody.  Even if the majority, eleven years later, were right that a reasonable jury could find that the requisite exigency did not exist, I am hard pressed to understand how these could be the actions of the "plainly incompetent," the "plainly unreasonable" or whatever other phrase we use to describe those denied qualified immunity.  Most notably, the majority does not hold that this statutory scheme is unconstitutional under the Fourth Amendment, making it exceedingly strange that the social workers could be found liable as a matter of law under the Fourth Amendment for *complying* with the only clearly established requirement in the case.  What the majority says in response—"The relevant question is whether there was *exigency*, not probable cause," Maj. Op. at 9—does not come to grips with the problem.  Under this provision of the statute, an exigency was required, and the state court found one—all at a time when the evidence was fresh and all by way of a decision the plaintiffs never challenged.

The other subsection of the Ohio statute also authorized the social workers' conduct.  Then and now, it allows social workers or officers to remove a child when they have "reasonable grounds to believe that the conduct, conditions, or surroundings of the child are endangering the health, welfare, or safety of the child."  Ohio Rev. Code § 2151.31(A)(6)(a).  For reasons of its own, the Ohio General Assembly did not provide an exigency requirement with respect to this subsection.  All that the subsection requires is endangerment.  And no one can fairly doubt that the social workers had ample evidence of endangerment before the seizure:  They had heard from one of the children (Danny) and others that the mother (Nancy Kovacic) had hit the children on different occasions and was failing to provide medication and clothing for visits with the father (Tom Kovacic), and the police officers underscored the potential fragility of Nancy's mental state.  On this statutory and evidentiary record, it is hard to say that the social workers' removal of the two children was *ultra vires*.  An Ohio statute allowed them to do just what they did.

No doubt, a state law might empower conduct that nonetheless violates the Federal Constitution. And from the vantage point of 2013, that is true here: The current requirements of the Fourth Amendment and this second provision (§ 2151.31(A)(6)) cannot co-exist. But until a court declares the statute unconstitutional, which no court has done and which the majority is unwilling to do (directly) today, it surely favors the government official in a qualified immunity case that a state law authorized his or her conduct. *Cf. Pierson*, 386 U.S. at 557. Only if the law is "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws" will the qualified immunity veil be pierced. *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979).

As to the second provision, even if the social workers lacked evidence that the children were *immediately* endangered, they could reasonably think that these children were endangered and they could reasonably think that this authorization to protect the safety of a child was not a "gross[]" violation of the Fourth Amendment. *Id.* When a state statute expressly authorizes conduct, when it remains good law eleven years later and when it is not grossly unconstitutional, that provides a sound explanation for granting qualified immunity.

The majority resists dealing with subsection (6) because, it says, "[t]here is no evidence that the social workers in this case entertained § 2151.31(A)(6) as a possible basis for removal at any point in the discussions or proceedings." Maj. Op. at 16. But it is core Fourth Amendment law that we do not examine the actual reason officers seize someone. "[T]he fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978); *see Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Illinois v. Krull*, 480 U.S. 340 (1987). Surely, if an officer may stop someone for a bad reason but an objectively good one permits—and will uphold—the stop, a social worker may subjectively rely on one

approach for seizing a child and use that approach and another (not considered at the moment) to justify her actions.

*Second*, the state of Fourth Amendment law with respect to what all can agree is a difficult issue—how to balance the safety of children from irreversible harm against the unforgettable harm of removing children from their family—was unclear in 2002. Our circuit had, and still has, little case law about how the Fourth Amendment applies in the context of child abuse. In *Jordan v. Murphy*, 145 F. App'x 513 (6th Cir. 2005), a case involving events in 1998, we observed that "neither the Supreme Court nor this Court have explicitly held that the Fourth Amendment does not create a social worker exception," which is to say for better or worse we had not yet decided *whether* the Fourth Amendment applied to a child-safety seizure. *Id.* at 517 n.2. In that case, we granted qualified immunity to a social worker for a warrantless entry into an allegedly neglected child's home when a police officer concluded that "the condition of the house required immediate intervention." *Id.* at 517. Just last year, we relied on this dearth of case law in granting qualified immunity to social workers for a warrantless entry in 2008, noting that "*Jordan* fails to give clear guidance" about the issue. *Andrews v. Hickman Cnty.*, 700 F.3d 845, 861 (6th Cir. 2012) (calling *Jordan* "the only case from our court that bears on the issue of" social worker liability under the Fourth Amendment).

Nor, most importantly, was it fair to assume in 2002 that the Fourth Amendment meant the same thing with respect to all warrantless seizures and entries—whether the official was engaged in traditional law enforcement (trying to prevent the destruction of drugs or to seize a criminal suspect) or was engaged in traditional social services (trying to prevent a parent from irreversibly hurting a child). *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661 (1995) (discussing "special needs" exceptions to the warrant requirement). Protecting children often differs from solving crimes, *see Gates v. Tex. Dep't of Protective & Reg. Servs.*, 537 F.3d 404, 427–28 (5th Cir. 2008), and there is no indication in the record that the social workers here were engaged in a criminal investigation. As *Andrews* and *Jordan* indicate, the law in this area was far from clear

in 2002, making it understandable and reasonable for a social worker (potentially) to find himself on the wrong side of the constitutional line after a seizure, particularly eleven years after the seizure.

All the majority says in response to *Andrews* and *Jordan* is that they involved entries, not seizures. But both cases could lead a reasonable social worker to think that the Fourth Amendment did not apply to them *at all*—that the Fourth Amendment did not regulate entries *or* seizures and that, even if it did apply, the rules for immediately seizing illicit drugs differed from the rules for seizing endangered children. *See Andrews*, 700 F.3d at 863 ("[I]t was not evident [in 2008] under clearly established law whether the [social workers] were even required to comply with the strictures of the Fourth Amendment."); *Jordan*, 145 F. App'x at 517 n.2. If the majority were right—that the baseline presumption for the clearly established inquiry is that the Fourth Amendment applies to everyone, including social workers, in the absence of contrary case law—*Jordan* was incorrectly decided. But that should be *our* problem and *our* mistake, not the *social workers'* problem and *their* mistake.

Just as our court in the past has sent mixed messages on this score, so have other circuits. By 2002, three circuits had concluded to varying degrees that social workers did not get special Fourth Amendment treatment. *See Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1108 (9th Cir. 2001); *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010 (7th Cir. 2000); *Tenenbaum v. Williams*, 193 F.3d 581, 605 (2d Cir. 1999). Even this conclusion, however, did not come easily. *Tenenbaum*, for example, struggled with whether a "special needs" exception applied to social workers, and "refrain[ed] from deciding categorically . . . that the removal of a child of whom abuse is suspected is not a 'special needs' situation." 193 F.3d at 604.

Other circuits have charted other paths. As of 2002, the Fifth Circuit decided not "to choose between applying the traditional [and] the special needs doctrines" in this setting. *Roe v. Tex. Dep't of Protective and Reg. Servs.*, 299 F.3d 395, 401 (5th Cir. 2002). And the Tenth Circuit waited until 2003 to explain that preventing child abuse was not a "special need that renders the warrant requirement impracticable." *Roska v.*

*Peterson*, 328 F.3d 1230, 1241 (10th Cir. 2003). Some circuits suggested that suspicions of *past* abuse, rather than *impending* abuse, might be enough for an unauthorized removal, which would have covered the social workers here. *See Hatch v. Dep't for Children*, 274 F.3d 12, 22 (1st Cir. 2001) ("[T]he Constitution allows a case worker to take temporary custody of a child, without a hearing, when the case worker has a reasonable suspicion that child abuse *has occurred*.") (emphasis added); *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997) (stating that removal is allowed when a social worker has "a reasonable suspicion that a child has been abused").

Nor, even if we overlook the state court's exigency finding *in this case*, would we be the first circuit to look at the state of the law in 2002 (or thereabouts) and decide that social workers who removed children without an exigency nonetheless deserved qualified immunity. *Gates*, 537 F.3d at 426; *see also Roska*, 328 F.3d at 1249–50 (finding exigency requirement for seizure of potentially abused children not clearly established); *see, e.g.*, *Mueller v. Auker*, 700 F.3d 1180, 1189 (9th Cir. 2012); *Martin v. St. Mary's Dep't of Soc. Servs.*, 346 F.3d 502, 507 (4th Cir. 2003); *Hatch*, 274 F.3d at 25. That is in part because the "amorphous" balance of the fragile and deeply sensitive interests involved makes it "difficult, if not impossible, for officials to know when they have violated 'clearly established' law." *Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir. 1992). So difficult, in fact, that a court that *denied* qualified immunity to social workers still took pains to explain that most "social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely—if ever—be clearly established." *Brokaw*, 235 F.3d at 1023.

To top it off, the Supreme Court granted certiorari two years ago to resolve a related question: Whether "traditional warrant/warrant-exception requirements," a "balancing standard" or a "special needs" standard applies to in-school seizures of potentially abused children. *See* Petition for Writ of Certiorari, *Camreta v. Greene*, 131 S. Ct. 2020 (2011) (Nos. 09-1454/1478). The Court found the case moot, 131 S. Ct. at

2036, and left that question and related questions up in the air—in 2011 and, it follows, in 2002.

As with *Andrews* and *Jordan*, the majority attempts to distinguish these other cases on grounds on which no reasonable social worker would think to distinguish them. A lack of clarity about whether and when a social worker can enter a home without a warrant suggests a lack of clarity about whether and when a social worker can seize a child without a warrant. A question about whether and when a social worker violates the Fourteenth Amendment by taking a child without holding a hearing suggests more questions about whether and when a court order is also necessary. At least two provisions of the Constitution (the Fourth and Fourteenth Amendments) regulate at least two stages of a social worker's investigation (searches and seizure), and a reasonable social worker could rely on precedents involving each relevant permutation. *See, e.g.*, *Gates*, 537 F.3d at 428–29 (citing procedural due process cases in determining relevant Fourth Amendment standard for child removal); *Roska*, 328 F.3d at 1249–50 (treating warrantless entry and seizure claims identically); *Brokaw*, 235 F.3d at 1022–23 (citing Fourth Amendment cases in determining whether procedural due process right was clearly established); *Tenenbaum*, 193 F.3d at 603–04 (describing the qualified immunity analysis for Fourth Amendment removal claim as "similar to our analysis of the individual defendants' immunity from the procedural due-process claims"). To that extent, the majority "betrays a mind-set more useful to those who officiate at shuffleboard games, primarily concerned with which particular square the disc has landed on, than to those who are seeking to" ensure children's safety. *Florida v. Royer*, 460 U.S. 491, 520 (1983) (Rehnquist, J., dissenting).

Fortifying the case for qualified immunity, courts *routinely* make exceptions to constitutional doctrines when the welfare of a child is at stake. The Free Speech Clause forbids punishing a person for what he reads at home, *see Stanley v. Georgia*, 394 U.S. 557 (1969)—but not if he's looking at child pornography, *see Osborne v. Ohio*, 495 U.S. 103 (1990). It prevents the government from regulating vulgar speech, *see Cohen v. California*, 403 U.S. 15 (1971)—but not when the speech reaches children's ears, *see*

*FCC v. Pacifica Found.*, 438 U.S. 726 (1978). The Free Press Clause ensures that newspapers have access to criminal trials, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)—but not when publicity would cause psychological harm to a child witness, *see Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 608–09 (1982). The Second Amendment protects a right to carry guns, *see District of Columbia v. Heller*, 554 U.S. 570 (2008)—but not in school zones, *see id.* at 626. The Confrontation Clause guarantees a defendant the right to meet adverse witnesses face-to-face, *see Mattox v. United States*, 156 U.S. 237 (1895)—but not when that would traumatize a child witness, *see Maryland v. Craig*, 497 U.S. 836 (1990). Should we fault social workers for thinking that courts would also calibrate the protections of the Fourth Amendment to account for the protection of children?

All appellate law considered, the social workers acted reasonably from the vantage point of 2002. Even had they consulted a lawyer at every turn, consider the many questions implicated by this case. Do the normal Fourth Amendment standards apply? Is there a special needs exception for child endangerment cases? Does it make a difference whether the state officials are engaged in investigating criminal conduct or protecting children? Does past abuse suffice? Must the evidence of danger be within the past 24 hours? Or will evidence over the last month suffice? The majority may have some confidence in answering some of these questions today. But in the face of our previous silence, the Supreme Court's continued silence and the conflicting signals sent by other circuits, I doubt even the most sophisticated social worker, accompanied by the most sophisticated attorney, could have distilled one framework for answering all of these questions in 2002. That is the purpose of qualified immunity, and that is why it applies here.

*Third*, qualified immunity protects state employees not just from after-the-fact second guessing when the law is unclear but also from after-the-fact second guessing when the facts are unclear. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (asking "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable"); *Feathers v. Aey*, 319 F.3d

843, 851 (6th Cir. 2003) ("[A]lthough the stop violated the Fourth Amendment . . . the individual defendants had a sufficient factual basis for thinking that they were acting consistently with" the Constitution.). Even if the majority were correct to say that no exigency existed in 2002, that does not mean qualified immunity is unavailable. To the contrary, the record shows that at worst the social workers acted negligently, not as government workers who "knowingly violate[d] the law," *Malley*, 475 U.S. at 341, when they (and the state court) found an immediate risk of harm.

Consider the evidence of risk, keep in mind the risk of being wrong and recall that "[t]he ultimate burden of proof is on appellee to show that appellants are not entitled to qualified immunity." *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991). The police knew Nancy well. She had filed a fabricated police report, stolen a gun from Tom (the father), made dozens of phony phone calls about Tom to the police, and assaulted Tom's sister, Colleen Nola, while the children (Danny and Katie) were watching. The social workers also knew Nancy well. Danny stabbed Nancy in the hand with a pen, allegedly in self-defense; reports suggested Nancy was providing inadequate clothing and medication for the children's visits with Tom; Nancy slapped Katie, pulled her hair and pushed her into a door frame; according to Danny, Nancy hit him regularly, and at one point she threw Danny onto his bed and tackled him onto the floor; and Nancy told the kids they were to blame for the divorce and the loss of her job and that they might have to go to foster care and she might have to go to jail if they said anything to social workers.

At the March 26 meeting between the social workers, the police, Tom, his father (Ed Kovacic) and Colleen, the police officers discussed these facts. R.48 (Kilbane Dep.) at 103; R.121-8 (Campbell Dep.) at 100–35; R.121-11; *cf.* Maj. Op. at 8 n.1. They then summarized their interactions with Nancy and expressed concerns that Danny and Katie were unsafe in her care and that Nancy was capable of killing them. In the face of what they already knew about Nancy and with the officers reinforcing those concerns, Ponstingle, Csornok and Cameron agreed that Danny and Katie were in imminent danger and needed to be removed from their home. According to Cameron, they felt that it was

an "urgent situation and something needed to be done now." R.121-7 (Cameron Dep.) at 51. In light of these facts and given Nancy's history, the social workers' actions at worst look like the kind of "mistake" that qualified immunity excuses. *Pearson*, 555 U.S. at 231.

How, the majority suggests, could the social workers reasonably have thought an exigency existed if they waited to act until after the meeting and well after they already knew some of the allegations of abuse? But, so far as the record shows, the meeting was the first time many of the relevant actors were in the same room—and as a result the shared information could reasonably have had a crystallizing effect on the social workers. Intelligence agencies are not the only government entities that face the risk of siloing information. As one of the social workers explained in her deposition:

> Q:     We talked about the safety concerns based on the North
>        Olmsted Police Department's comments and the alleged
>        escalating behavior. That was all information that came
>        to you on the 26th, correct?
> A:     Correct.
> Q:     You had no inkling of any of that or hadn't talked to any
>        of the North Olmsted Police officers prior to that, correct?
> A:     Correct.

Ponstingle Dep. at 144–45; *see also* Cameron Dep. at 41 ("By the end of the meeting, I did feel more keenly that [the children] were at a greater level of risk than I was perceiving."); *id.* at 67 ("I felt very strongly [after the meeting] that I had misinterpreted the seriousness of the [situation]."); Appellant Br. at 9 n.4, 10 n.6. Given this testimony and contrary to the majority's view (Maj. Op. at 8 n.2), the March 26 meeting gave the social workers a collective sense of risk that they did not individually appreciate before.

To say that social workers should have acted earlier, moreover, is not to say that they could not act later. But for *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 196–97 (1989), the social workers could be exposed to liability coming and going—for waiting too long to act in some settings and for acting too quickly in others. The point of qualified immunity is to give social workers room to operate

reasonably between these extremes, not to expose them to liability whenever they err in one direction or the other.

Any doubt about this point ought to be confirmed by the actions of the juvenile court three days after the seizure. *See* Ohio Rev. Code §§ 2151.31(A)(3)(b) and (c). No one complains that *this* provision of Ohio law—this explanation for removing children from their family—violates the Fourth Amendment. Within three days of the seizure and after a hearing, the judge found the requisite probable cause and the requisite exigency. *Cf. Messerschmidt v. Millender*, 132 S. Ct. 1235, 1250 (2012) ("The fact that the officers secured . . . approvals [from a magistrate and a prosecutor] is certainly pertinent in assessing whether they could have held a reasonable belief that the warrant was supported by probable cause."). And neither the children nor Ms. Kovacic challenged that decision. If ever there were a reason for granting qualified immunity, it would be this: The social workers faced an uncertain legal and factual landscape and decided to act; a state court judge found three days later that they acted properly; and the affected family members did not challenge the state court decision, thus permitting the children to live outside their mother's care for the next ten months. Even if *Heck* does not apply in this setting, *see Heck v. Humphrey*, 512 U.S. 477 (1994), and even if there is not a general exhaustion requirement for constitutional torts, it is surely material to the "clearly established" inquiry that the alleged victims of a child-endangerment investigation did not protest the seizure at the time.

It is true that the state court decision found that there *is* probable cause, not that there *was* probable cause, of the requisite exigency. But the children offer no evidence that anyone presented any new facts to the magistrate on the 29th that the social workers did not already know on the 26th. If removal on the 29th was in the children's best interests, and if the magistrate on the 29th thought probable cause of an exigency existed, it is hard to say that the social workers acted unreasonably on the 26th. Indeed, so far as the record shows, keeping in mind that the plaintiffs have the burden of production and persuasion, the state court relied on evidence that pre-dated even the March 26th meeting, suggesting that the social workers acted too slowly, not too

precipitously, in taking the children into custody. Even if that were not the case, it is unclear whether children living in "a home environment [that] is adjudicated to have been abusive" have "a cognizable constitutional right not to be prematurely removed from the premises." *Southerland v. City of New York*, 681 F.3d 122, 132 (2d Cir. 2012) (Raggi, J., dissenting from denial of rehearing in banc). When a social worker has concerns that immediate removal is required and when a state court judge later vindicates those concerns after a hearing, it is a strange notion of qualified immunity that would permit the social workers to be found liable under § 1983. We should pause before making social workers retroactively liable for a three-day temporary seizure when the state court judge is insulated from liability for the ten months of custody that followed. No such oddity occurs if we respect the state court's contemporaneous finding that probable cause of an exigency existed, which confirms that the social workers at most made a mistake.

In the end, these social workers faced two state laws allowing them to act, set against a murky backdrop of federal court precedent. And they had evidence of abuse, enough in fact to convince a magistrate that they acted correctly and that Nancy's children ought not stay in Nancy's care. Qualified immunity applies.

*2. Qualified immunity from the Fourteenth Amendment due process claim.* In addition to granting summary judgment for the children on their Fourth Amendment claim, the district court granted summary judgment on their due process claim under the Fourteenth Amendment. To my mind, the two doctrines run side by side. Under the Due Process Clause, a State must follow certain procedures before disrupting the parent-child relationship. *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007). While those procedures normally demand a pre-deprivation hearing, that is not true in the face of an immediate risk of harm to the children. *Id.*; *see also Hooks v. Hooks*, 771 F.2d 935, 942 (6th Cir. 1985). All of this takes me back to the same question asked and answered above: Under the state of the law in 2002, did the social workers act reasonably in seizing the children? For the reasons given above, I think they did.

*3. The district court's summary judgment ruling for the plaintiffs on the Fourth and Fourteenth Amendment claims.* There is one other oddity about the majority's decision. Before the district court were cross-motions for summary judgment, with the plaintiffs claiming they should win their Fourth and Fourteenth Amendment claims as a matter of law and the social workers claiming they should win those claims as a matter of law. The district court devoted all of its analysis to explaining why the plaintiffs should prevail as a matter of law on these claims and why the facts and law necessarily came out their way in piercing both prongs of the qualified immunity defense of the social workers—and in holding that all that remained was a damages trial on the plaintiffs' two claims. When the social workers appealed that judgment, according to the majority, they brought before this court only the *denial* of their motion for summary judgment, not the *grant* of the plaintiffs' motion for summary judgment on each claim. Put another way, the majority has written a decision that denies the social workers' motion for summary judgment on the ground that, once all reasonable factual inferences are run in favor of the plaintiffs, their defense must go to a jury—pretending that the district court's core holding that the plaintiffs win as a matter of law on both constitutional claims did not exist and somehow "reserv[ing] judgment on those issues." Maj. Op. at 11. Where to begin?

Parties appeal judgments, not opinions—more precisely final judgments and reviewable interlocutory orders, not opinions. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). In their notice of appeal, the social workers, government officials all, appealed the "Order entitled *Memorandum Opinion and Order (Doc. 132)*." R.135 at 1. That document included a number of orders, including most prominently the district court's order that "Summary judgment is GRANTED in favor of plaintiffs and DENIED as to defendants on plaintiffs' claims for unlawful seizure . . . and deprivation of their procedural due process rights to a notice and hearing . . . as against defendants Ponstingle, Cameron, and Csornok." R. 132 at 56. If an officer has a right to an interlocutory appeal challenging a district court's decision to send certain claims to a jury in the face of a qualified immunity defense, she surely has a right to an interlocutory appeal challenging a district court's decision that she loses

those same claims as a matter of law. *See, e.g.*, *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 549 (6th Cir. 2002); *Risbridger v. Connelly*, 275 F.3d 565 (6th Cir. 2002); *Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157 (6th Cir. 1996); *Mueller*, 576 F.3d at 987–91 (9th Cir. 2009); *Sherbrooke v. City of Pelican Rapids*, 513 F.3d 809, 813 (8th Cir. 2008); *Anderson v. Recore*, 446 F.3d 324, 328 (2d Cir. 2006); *Jackson v. Sauls*, 206 F.3d 1156, 1164 (11th Cir. 2000); *Hodge v. Jones*, 31 F.3d 157, 168 (4th Cir. 1994). The majority opinion offers no contrary authority. There is none.

Having appealed the relevant order, the social workers proceeded in their appellate briefs to attack *all* of the legal analysis pertinent to the district court's decision to grant victory to the plaintiffs as a matter of law. *See, e.g.*, Br. at 7–10, 12–13, 20–22, 25–27; Reply Br. at 2–7. That was not hard. All of the district court's orders contain *just one* legal analysis relevant to this point, and it arises in the context of the court's decision to grant summary judgment for the plaintiffs. Of course, in other words, the social workers challenged the district court's legal reasoning relevant to the grant of summary judgment to the plaintiffs and denial of it to the social workers—because that was all there was. On this record, it is not plausible to say that the social workers somehow appealed only the denial of their motion for summary judgment and forfeited their right to challenge the district court's grant of summary judgment to the plaintiffs. That did not happen in the notice of appeal, and it did not happen in the appellate briefing.

Nor do the *plaintiffs* think otherwise. They did not argue in their appellate brief that the social workers forfeited their right to challenge the summary judgment ruling for the plaintiffs. If the social workers forfeited a challenge to the ruling in favor of the plaintiffs, in other words, the plaintiffs forfeited the forfeiture. *United States v. Turner*, 602 F.3d 778, 783 (6th Cir. 2010). But the plaintiffs should not feel bad. There is a good reason they did not argue that the social workers forfeited any challenge to the summary judgment ruling for them. It would not make sense—and not just because the notice of appeal and appellate briefs preserved the argument. If true, it would mean the social workers forfeited the *entire* appeal. For if the district court's matter-of-law ruling

for the plaintiffs stands (because forfeited), it is not possible to rule for the defendants as a matter of law or even to let them have their day in court in front of a jury. Both potential rulings cannot co-exist with the (purportedly) unchallenged ruling that plaintiffs win as a matter of law. This unusual turn of events deserves an explanation. The majority does not give one.

That leaves one more nail. The majority is mistaken even on its own terms. The apparent premise of the majority's opinion is that the social workers appealed only the order denying their motion for summary judgment, not the order granting summary judgment to the plaintiffs. But if that were true—it is not—an appeal brings with it the analytical basis for that ruling. There is just one analytical premise for *that* ruling—the district court's 24 pages of analysis explaining why the plaintiffs win as a matter of law on those same two constitutional claims. If the majority is unwilling to let the social workers explain why those 24 pages of analysis are wrong, there is little, if anything, to argue—and no point to this appeal. The sole analytical premise for the denial of the social workers' motion for summary judgment was that "[n]o reasonable juror could find that Ms. Kovacic posed an imminent threat of physical harm to her children." R.132 at 21. How can the social workers challenge the denial of their motion for summary judgment—the ruling the majority concedes is before us—without challenging that reasoning? And how can they win that part of their appeal without defeating that analysis? Not losing is a necessary first step to winning. The same is true for the prong two—clearly established—inquiry. *Id.* at 46. Since it "already held that defendants' actions violated plaintiffs' constitutional rights . . . the only remaining inquiry [was] whether those rights were clearly established." *Id.* at 46. District court's answer: yes. *Id.* at 49. Social workers' appeal: no. All of this is, and must be, before us.

Nor can the majority escape this bind by invoking pendent appellate jurisdiction, claiming that the plaintiffs' victory as a matter of law is only before us through this doctrine and claiming that we have discretion—a choice—to consider the merits of this ruling. Maj. Op. at 9–11. That doctrine has nothing to do with this case, and no party argues otherwise. There might be a debate about pendent appellate jurisdiction, for

example, if the social workers had lost some *state law* defenses (or other *separate* defenses arising from the same incident) and if they had sought interlocutory review of them along with review of an order denying relief on federal defenses. But this was an appeal by the social workers with respect to losses on their *federal* defenses and federal defenses alone. The Mount Everest of appealable orders is a challenge to a district court's order that government employees lose a federal § 1983 claim as a matter of law—the very ruling the majority opts not to review. Pendent appellate jurisdiction simply is not at issue, and we have no discretion to avoid ruling on the be-all-and-end-all of the social workers' appeal: They cannot possibly win as a matter of law if they lose as a matter of law.

The only two cases in our circuit arising in a similar posture, *Farm Labor* and *Brennan*, do not help the majority, for they *exercise* jurisdiction over a matter-of-law ruling against the defendants. 308 F.3d at 551; 78 F.3d at 1158. Those cases obviously do not *hold* that we have discretion *not* to exercise jurisdiction over such a ruling, whether under the name of pendent appellate jurisdiction or some other doctrine. Not only do the cases not establish relevant holdings on point, but the dicta in them misapprehends the concept of pendent appellate jurisdiction. As its name implies, pendent appellate jurisdiction brings in related claims that are nonetheless different from the matter that is already before the court. It makes no sense to apply that doctrine to the *same claim*—here, the Fourth and Fourteenth Amendment claims raised by the plaintiffs and defendants on qualified immunity grounds.

The majority's opinion leaves open the possibility (I think) that, after the damages trial on the plaintiffs' Fourth and Fourteenth Amendment claims, our court could still determine that the plaintiffs should not have won as a matter of law and then determine that a trial must be held after all—more than a dozen years after the underlying incident and many more years after useful memories of it have faded. That would be a first in my experience with interlocutory qualified immunity appeals—and hardly a model of fair and efficient court administration. By being whisper quiet about all of these things, moreover, the majority permits the inferences from the deposition

testimony to run in favor of the plaintiffs today.  Of course, if we reviewed the appealed, argued and core question raised on appeal—did the trial court properly grant judgment as a matter of law to the plaintiffs?—the inferences all would run in favor of the social workers.

I respectfully dissent.